**FILED**

FEB 2 4 2003

Phil Lombardi, Clerk
U.S. DISTRICT COURT

UNITED STATES FEDERAL DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

# 03C V133 E (C)

JOHN MELVIN ALEXANDER; JUANITA
DELORES BURNETT ARNOLD; J.B.
BATES; ESSIE LEE JOHNSON BECK;
THELMA DUNN BEDELL; JAMES D.
BELL; PHINES BELL; FRANCES
BLACKWELL; JUANITA WILLIAMS
BLAKELY; JUANITA SMITH BOOKER;
KINNEY BOOKER; DOROTHY BOOKER
BOULDING; JEANETTE McNEAL
BRADSHAW; TERESA EARLEE BRIDGES
DYSART; JOHNNIE L. GRAYSON BROWN;
CLARENCE BRUNER; LULA BELLE LACY
BULLOCK; JOE R. BURNS; ROSA L.
GREEN BYNUM; MURIEL MIGNON LILLY
CABELL; BEATRICE CAMPBELL-
WEBSTER; JAMES DALE CARTER;
ROSELLA CARTER; SAMUEL CASSIUS;
NAOMI HOOKER CHAMBERLAIN; MILDRED
MITCHELL CHRISTOPHER; MILDRED
LUCAS CLARK; OTIS GRANVILLE
CLARK; SANDY CLARK; BLANCHE
CHATMAN COLE; WORDIE "PEACHES"
MILLER COOPER; CARRIE HUMPHREY
CUDJOE; LaVERNE COOKSEY DAVIS;
HATTIE LILLY DUNN; JAMES DURANT;
LUCILLE B. BUCHANAN FIGURES;
ARCHIE JACKSON FRANKLIN; JIMMIE
LILLY FRANKLIN; JOAN HILL
GAMBREL; ERNESTINE GIBBS; HAROLD
GIBBS; MARGARET TILLEY GIBBS;
THERESSA CORNELLA McNEAL GILLIAM;
LEON GRAYS, SR.; HAZEL FRANKLIN
HACKETT; MILDRED JOHNSON HALL;
NELL HAMILTON HAMPTON; LEROY LEON
HATCHER; MADELEINE HAYNES; JAMES
FRISSELL "BOTTLEHEAD" HILL; JOYCE
WALKER HILL; DR. OLIVIA J.
HOOKER; SAMUEL L. HOOKER, JR.;

CASE NO. _____

COMPLAINT FOR:

(1) DEPRIVATION OF LIFE
    AND LIBERTY AND THE
    PRIVILEGES AND
    IMMUNITIES OF UNITED
    STATES CITIZENSHIP IN
    VIOLATION OF THE
    FOURTEENTH AMENDMENT
    OF THE U.S.
    CONSTITUTION;

(2) DEPRIVATION OF
    PROPERTY AND
    PRIVILEGES AND
    IMMUNITIES OF UNITED
    STATES CITIZENSHIP IN
    VIOLATION OF THE
    FOURTEENTH AMENDMENT
    OF THE U.S.
    CONSTITUTION;

(3) VIOLATION OF THE EQUAL
    PROTECTION CLAUSE AND
    THE PRIVILEGES AND
    IMMUNITIES CLAUSE OF
    THE FOURTEENTH
    AMENDMENT OF THE U.S.
    CONSTITUTION;

(4) VIOLATION OF U.S.C.
    §1981;

(5) VIOLATION OF U.S.C.
    §1983;

Draft G

-1-

COMPLAINT

| | |
|---|---|
| 1 WILHELMINA GUESS HOWELL; CHARLES ) | (6) VIOLATION OF U.S.C. |
| HUGHES; MYRT WELLS HURD; VERA ) | §1985; |
| 2 INGRAM; EUNICE CLOMAN JACKSON; ) | |
| GENEVIEVE ELIZABETH TILLMAN ) | (7) PROMISSORY ESTOPPEL. |
| 3 JACKSON; WILLIE BELL WHITE ) | |
| JACKSON; DR. HOBART JARRETT; ) | |
| 4 ARTIE LACY JOHNSON; WILMA ) | |
| MITCHELL JOHNSON; EDWARD EARVEN ) | Filing Date: _____ |
| 5 JONES; HAZEL DOLORES SMITH JONES; ) | Trial Date: _____ |
| THELMA THURMAN KNIGHT; LEANNA ) | |
| 6 JOHNSON LEWIS; KATIE MAE JOHNSON ) | |
| LIVINGSTON; ALICE HIGGS LOLLIS; ) | |
| 7 ROANNA HENRY McCLURE; ELDORIS MAE ) | |
| ECTOR McCONDICHIE; CAROL ) | |
| 8 SMITHERMAN MARTIN; MARY TACOMA ) | |
| MAUPIN; WILLIE MUSGROVE MEANS; ) | |
| 9 ISHMAEL S. MORAN; RUTH DEAN NASH; ) | |
| SIMEON L. NEAL; ALMADGE J. ) | |
| 10 NEWKIRK; MYRTLE NAPIER OLIVER; ) | |
| JUANITA MAXINE SCOTT PARRY; IDA ) | |
| 11 BURNS PATTERSON; FREDDIE SCOTT ) | |
| PAYNE; JOAN ALEXANDER POWDRILL; ) | |
| 12 ALICE PRESLEY; DeLOIS VADEN ) | |
| RAMSEY; CORA HAWKINS RENFRO; ) | |
| 13 SIMON R. RICHARDSON; JEWEL ) | |
| SMITHERMAN ROGERS; JULIUS WARREN ) | |
| 14 SCOTT; ORA LEE SCOTT; TULETA S. ) | |
| DUNCAN SHAWNEE; VENEICE DUNN ) | |
| 15 SIMMS; HAL "CORNBREAD" SINGER; ) | |
| BEULAH LOREE KEENAN SMITH; GOLDEN ) | |
| 16 WILLIAMS SMITH; LOLA SNEED ) | |
| SNOWDEN; JAMES L. STEWARD; ) | |
| 17 DOROTHY WILSON STRICKLAND; SARAH ) | |
| TATUM; LOIS WHITE TAYLOR; WILLIE ) | |
| 18 MAE SHELBURN THOMPSON; EFFIE LEE ) | |
| SPEARS TODD; MELVIN C. TODD; ) | |
| 19 KATHRYN MAE TAYLOR TOLIN; BESSIE ) | |
| MAE AUSTIN VESTER; QUEEN ESTHER ) | |
| 20 LOVE WALKER; SAMUEL WALKER; TROY ) | |
| SIDNEY WALKER; OSCAR DOUGLAS ) | |
| 21 WASHINGTON; MARY LEON BROWN ) | |
| WATSON; ALLEN MATTHEW WHITE; ) | |
| 22 CECIL WHITE; MARIE WHITEHORN; ) | |
| MILDRED EVITT WILBURN; BERTRAM C. ) | |
| 23 WILLIAMS; LOUIE BARTON WILLIAMS; ) | |
| WESS YOUNG; JOHN HOPE FRANKLIN; ) | |
| 24 CAESAR LATIMER; WILLIAM ) | |
| SHAKESPEARE LATIMER; JAYPHEE ) | |
| 25 CLINTON; MAJOR SYLVESTER LATIMER; ) | |

26

ELIHU LATIMER; FRED LATIMER, SR.; )
PATELLA LATI    PEGUES; THELLA    )
LATIMER; ELLA LATIMER BRADFORD;    )
MAGGIE LATIMER; ALICE LATIMER;    )
CHRISTOPHER ANITA WILLIAMS;    )
ARTHUR JEFFERSON; JESSIE THOMAS;    )
JUANITA ALEXANDER HOPKINS;    )
JOHNETTA ADAMS; RHONDA ANDERSON;    )
ROBERT EARL ANDERSON; DIANE    )
ANDERSON STEELE; MARIETTA    )
ANDERSON WAITERS; RUTH ELLA    )
AUTRY, JAMES AUTRY, OTIS AUTRY;    )
ELMER AUTRY; AILEEN JOANNE AUSTIN )
COBURN;  LEONA AUSTIN McCAIN;    )
RAMONA DINKINS WIMBERLY; ERLINE    )
CROSSLIN, BILLIE WAYNE RUCKER; J. )
C. RUCKER; ROBERT C. RUCKER;    )
ROSELLA TURNER; JOHN BAILEY; ROY    )
DAVIS; A. BANKS; BERNICE BANKS    )
DAVIS; AUDREY BANKS PARSON: MARY    )
BELL ARRINGTON; R.G. BELL;    )
CATHRYN BELL SNODDY; LISA    )
PRESLEY; JILL ELIZABETH PRESLEY;    )
JEAN WILLIAMS MCGILL; MATTIE    )
DAVIS OLIVER; ALLENE KNIGHTEN    )
RAYFORD; JAMES BERNARD KNIGHTEN;    )
BERNICE LAWLER; LORRAINE    )
MCFARLAND; THELMA KINLAW GERMANY; )
DOROTHY JONES; NANCY MARTIN,    )
CATHERINE MARTIN, JAMES PRESTON    )
MARTIN; FELTON MARTIN; LESLIE    )
BEARD; MARY PRISCILLA PARKER    )
HARRISON;  GENIEIVE JACKSON;    )
DIANA LYNN SHELTON; SHIRLEY    )
SHELTON; OSCAR BOYD; ALICE BOYD    )
VAUGHN; HELEN SIPUEL HUGGINS;    )
LAVADA LOUISE PARKER OSBOURNE;    )
HOWARD LEROYD DENNIE; LAWRENCE    )
HERMAN DENNIE; ALFREDA O. DENNIE    )
FRANKLIN; NORMAN JEAN DENNIE    )
LESHIE; FRANK EUGENE RODGERS; IDA )
LOUISE DENNIE WILLIS; EDNA EARLY    )
WORKS; ORA SMITH; LEONA JERRYE    )
BRUNER ANTHONY; CLIFTON JOE    )
TIPTON; NAOMI LAWSON BROWN;    )
EDWARD LAWSON; BERNARD CARTER;    )
EDDIE HUE CARTER; ROBERT CARTER,    )
JR.; SAMUEL LEE CARTER; BOBBIE    )
JEAN CARTER TENNYSON; JOHNNYE    )

| | |
|---|---|
| 1 | CANNON LAWSON; NATHANIEL ) |
| | CANNON; HENRY CANNON; MILDRED ) |
| 2 | CANNON WALLACE; SARAH CURVAY ) |
| | MAYSHAW; LINDA EDMONDSON GRAVES; ) |
| 3 | NAOMI NASH WILLIAMS WIMBERLY; ) |
| | PATRICIA WILLIAMS; PEGGY ANN ) |
| 4 | MCRUFFIN MITCHELL; AUDELE BEEKS ) |
| | MCLEOD; FELICIA MCLEOD JOHNSON; ) |
| 5 | WALLACE MCLEOD, JR.; DELLA ) |
| | SHELTON JACKSON; JOHNNY SHELTON; ) |
| 6 | FAYE MAY; BETTY ANDERSON; MAIME ) |
| | SHELTON; BILLY SHELTON; MARGARET ) |
| 7 | LEE; EUNA VANN SMITH, MARIETTA ) |
| | ANDERSON WAITERS; IRMA THOMAS ) |
| 8 | ANTHONY; LEONTYNE THOMAS HARRELL; ) |
| | JERRY FIELDS THOMAS; OVEID LACY ) |
| 9 | III; ROBERT LACY; NICHOLAS A. ) |
| | BANKS; BERNICE E. DAVIS; AUDREY ) |
| 10 | PARSONS; LEROY KIRK, JR.; MAE ) |
| | ETTA REYNOLDS; JOHN W. PATTON; JO ) |
| 11 | ANN EWING; WANDA EWING POPE; ) |
| | ROBERT EWING; BILL EWING; BOBBYE ) |
| 12 | LOUISE GILBERT; FANNIE WILLIAMS; ) |
| | SIMON BERRY JR.; MARGUERITE ) |
| 13 | BAGBY; MAXINE JESSIE VADEN; JOYCE ) |
| | RAMSEY; RAYMOND BEARD, SR.; FLOYD ) |
| 14 | PRICE; CAROLYN PRICE JOHNSON; ) |
| | MILDRED LOUISE DAVIS SCOTT; FRED ) |
| 15 | DAVIS; SANDRA JEAN DAVIS ) |
| | LANDRUM; ROSIE LEE JACKSON; FRED ) |
| 16 | SMITH; FANNIE SMITH VERNER; ERMA ) |
| | SMITH THOMPSON; DELORES ) |
| 17 | HARRINGTON; SHIRLEY RIDLEY; PAT ) |
| | MOORE; SHIRLEY TYUS; SELMA ) |
| 18 | LOCKARD; FRANK LOCKARD; JESSIE ) |
| | MAE LOCKARD; EDWARD LOCKWARD; ) |
| 19 | ERNEST LOCKARD; OSCAR LOCKARD; ) |
| | CORTEZ LOCKARD; EMMA LOCKARD ) |
| 20 | HORN; PATRICIA WILLIAMS; LORENZO ) |
| | CARLOS VANN; CARRIE M. MCDONALD ) |
| 21 | STROTHER; MARY A. WILSON; JIMMIE ) |
| | WICKAM; FRANK WALKER, SR.; MARIA ) |
| 22 | WALKER; RILEY WALKER, JR. DANIEL ) |
| | WALKER BITSON, JR., KEITH ) |
| 23 | HAMILTON; CARL WALKER, JR., ) |
| | EDWINA WALKER CARR; MARCIA ) |
| 24 | WALKER POCKET; WILLIAM D. WALKER; ) |
| | OLENE WALKER WASHINGTON; JEANETTE ) |
| 25 | HAWKINS; OLANDER HAWKINS; STARLA ) |
| 26 | |

```
 1 | HAWKINS; CHARLOTTE WILLIAMS;      )
   | NAOMI LAWSON   OWN; EDWARD        )
 2 | LAWSON; MARCUS LAWSON;   MARGARET )
   | ANN LAWSON; PALMER LAWSON, JR.;   )
 3 | WILBUR FOSTER; RONALD MOORE;      )
   | BERNARD CARTER; EDDIE CARTER;     )
 4 | ROBERT CARTER, JR.; SAMUEL LEE    )
   | CARTER; BOBBIE JEAN CARTER        )
 5 | TENNYSON; DOROTHY WILLIAMS        )
   | BRANLETT; GRANT WILLIAMS; TERRY   )
 6 | NASH; AUDREY TAYLOR; BYRON        )
   | TAYLOR; GERALDINE PERRYMAN-TEASE; )
 7 | MILDRED MARIAN HAMEL MILLER;      )
   | LADAWNA MILLER; PATSY ROBINSON;   )
 8 | MARGARET THARPE; MAXINE JACKSON   )
   | LACY; RAYMOND PRESLEY,            )
 9 |                                   )
   |               Plaintiffs,         )
10 |                                   )
   |      v.                           )
11 |                                   )
   | THE GOVERNOR OF THE STATE OF      )
12 | OKLAHOMA (in his official         )
   | capacity); THE CITY OF TULSA; THE )
13 | CHIEF OF POLICE OF THE CITY OF    )
   | TULSA (in his official capacity); )
14 | THE CITY OF TULSA POLICE          )
   | DEPARTMENT; and DOES 1 through    )
15 | 100, inclusive,                   )
   |                                   )
16 |               Defendants.         )
   |                                   )
17 | _____  )
   |                                   )
```

## COMPLAINT

### (Jury Trial Requested)

Plaintiffs JOHN MELVIN ALEXANDER et al. allege as follows:

1.     This action arises under the Fourteenth Amendment to the Constitution of the United States; the Civil Rights Act of April 9, 1866, 14 Stat. 27, currently codified at 42 U.S.C. §1981; the Civil Rights Act of April 20, 1871, 17 Stat. 13, currently codified at 42 U.S.C. §§1983, 1985(3). Jurisdiction is based on 28 42 U.S.C. §§1331, 1343, and 1367.

## HISTORICAL OVERVIEW OF THE CIRCUMSTANCES

### THAT PRECIPITATED THIS SUIT

#### A.     Plaintiffs And Defendants

2.     Plaintiffs, United States citizens, are the African American survivors of the "Tulsa Race Riot" of May 31, 1921 to June 1, 1921, and/or their descendants who were African American residents of the Greenwood section of the City of Tulsa ("Greenwood"). They bring this suit for restitution and repair of the injuries sustained by them or their relatives from the actions and inaction of the STATE OF OKLAHOMA and the CITY OF TULSA for acts they committed during and in the aftermath of the Riot. Defendants the STATE OF OKLAHOMA and the CITY OF TULSA conspired together and acted in concert with one another throughout and after the riot. The Defendants called out local units of the State National Guard and deputized white citizens

of Tulsa, Oklahoma ("Tulsa"), who, acting under color of state law, participated as members of a white mob in a race riot that was designed to, and did in fact, brutalize and terrorize the African American residents of the Greenwood District. Almost every building in the Greenwood District was razed to the ground.

3. One group of Plaintiffs was forcibly removed from their homes by the white mob that included Defendants' lawful agents. That group includes: THELMA DUNN BEDELL, who escaped while shots were fired at her home; FRANCES BLACKWELL; NELL HAMILTON HAMPTON; ISHMAEL S. MORAN; JUANITA MAXINE SCOTT PARRY; and JAMES L. STEWARD, who was forced out of his home after the rioting white mob set fire to the building while he and his family were still inside.

4. Other Plaintiffs escaped from the mob only to be captured later by the members of Defendant the City of Tulsa's police force or by the National Guard. They include Plaintiffs JOHN ALEXANDER, JUANITA SMITH BOOKER, KINNEY BOOKER, DOROTHY BOOKER BOULDING, JOHNNIE L. GRAYSON BROWN, JOE R. BURNS, ROSA L. GREEN BYNUM, BEATRICE CAMPBELL-WEBSTER, NAOMI HOOKER CHAMBERLAIN, MILDRED MITCHELL CHRISTOPHER, CARRIE HUMPHREY CUDJOE, LUCILLE BUCHANAN FIGURES, ERNESTINE GIBBS, HAROLD GIBBS, HAZEL FRANKLIN HACKETT, MADELEINE HAYNES, JOYCE WALKER HILL, VERA INGRAM, EUNICE CLOMAN JACKSON, DR. HOBART JARRETT, HAZEL DELORES SMITH JONES, MARY TACOMA MAUPIN, ALICE HIGGS LOLLIS,

ISHMAEL S. MORAN, SIMON R. RICHARDSON, BEULAH LOREE KEENAN

SMITH, GOLDEN WILLIAMS SMITH, DOROTHY WILSON STRICKLAND, LOIS

WHITE TAYLOR, BERTRAM C. WILLIAMS, LOUIE BARTON WILLIAMS, and

WESS YOUNG.

5. Other Plaintiffs were forced to flee town
completely. They include J.B. BATES, LULA BELLE LACY BULLOCK,
JAMES DALE CARTER, who was carried forty miles by his mother,
ROSELLA CARTER, OTIS GRANVILLE CLARK, LEROY LEON HATCHER, who
walked nine miles to escape the rioting white mob, JOYCE WALKER
HILL, EDWARD EARVEN JONES, ELDORIS MAE ECTOR McCONDICHIE, SIMEON
L. NEAL, RUTH DEAN NASH, JUANITA MAXINE SCOTT PARRY, IDA BURNS
PATTERSO, ALICE PRESLEY, ORA LEE SCOTT, TULETA S. DUNCAN
SHAWNEE, BEULAH LOREE KEENAN SMITH, LOLA SNEED SNOWDEN, LOIS
WHITE TAYLOR, WILLIE MAE SHELBURN THOMPSON, QUEEN ESTHER LOVE
WALKER, who was shot at as she attempted to flee, and MARIE
WHITEHORN

6. These and other Plaintiffs had their property
looted and burned by the white mob acting under color of state
law. They include J.B. BATES, ESSIE LEE JOHNSON BECK, J.D.
BELL, PHINES BELL, JUANITA SMITH BOOKER, KINNEY BOOKER, DOROTHY
BOOKER BOULDING, JEANETTE McNEAL BRADSHAW, TERESA EARLEE BRIDGES
DYSART, JOHNNIE L. GRAYSON BROWN, ROSA L. GREEN BYNUM, MURIEL
MIGNON LILLY CABELL, MILDRED MITCHELL CHRISTOPHER, MILDRED LUCAS
CLARK, OTIS GRANVILLE CLARK, BLANCHE CHATMAN COLE, CARRIE
HUMPHREY CUDJOE, HATTIE LILLY DUNN, JAMES DURANT, LUCILLE

BUCHANAN FIGURES, ARCHIE JACKSON FRANKLIN, JIMMIE LILLY
FRANKLIN, ERNESTINE GIBBS, HAROLD GIBBS, MARGARET TILLEY GIBBS,
THERESSA CORNELLA McNEAL GILLIAM, LEON GRAYS, SR., MILDRED
JOHNSON HALL HAZEL FRANKLIN HACKETT, LEROY LEON HATCHER,
MADELEINE HAYNES, JAMES FRISSELL "BOTTLEHEAD" HILL, JOYCE WALKER
HILL, DR. OLIVIA J. HOOKER, SAMUEL L. HOOKER, JR., WILHELMINA
GUESS HOWELL, VERA INGRAM, GENEVIEVE ELIZABETH TILLMAN JACKSON,
DR. HOBART JARRETT, WILMA MITCHELL JOHNSON, HAZEL DELORES SMITH
JONES, THELMA KNIGHT, CAROL SMITHERMAN MARTIN, MARY TACOMA
MAUPIN, RUTH DEAN NASH, SIMEON L. NEAL, ALMADGE J. NEWKIRK,
JUANITA MAXINE SCOTT PARRY, IDA BURNS PATTERSON, DELOIS VADEN
RAMSEY, JEWEL SMITHERMAN ROGERS, JULIUS WARREN SCOTT, VENEICE
DUNN SIMS, BEULAH LOREE KEENAN SMITH, GOLDEN WILLIAMS SMITH,
LOLA SNEED SNOWDEN, JAMES L. STEWARD, DOROTHY WILSON STRICKLAND,
LOIS WHITE TAYLOR, WILLIE MAE SHELBURN THOMPSON, EFFIE LEE
SPEARS TODD, MELVIN C. TODD, QUEEN ESTHER LOVE WALKER, SAMUEL
WALKER, TROY SIDNEY WALKER, and MARY LEON BROWN WATSON.

      7. Other Plaintiffs were physically injured. They
include CARRIE HUMPHREY CUDJOE, JAMES DURANT, and BEULAH LOREE
KEENAN SMITH.

      8. Other Plaintiffs had family members who were
killed by the rioting white mob. They include J.B. BATES, LEROY
LEON HATCHER, and CECIL WHITE.

      9. The rioting white mob so terrorized many of the
Plaintiffs' families, including those of LEON GRAYS, SR.,

1 ELDORIS MAE ECTOR McCONDICHIE, ALICE PRESLEY, and WILLIE MAE

2 SHELBURN THOMPSON that they left Tulsa or the State of Oklahoma

3 for good in the wake of the riot.

4         10. Many of the Plaintiffs' families were denied the

5 opportunity to rebuild their homes and businesses in Greenwood

6 subsequent to the riot.

7         11. THE GOVERNOR OF THE STATE OF OKLAHOMA and the

8 TULSA CHIEF OF POLICE are sued in their official capacity

9 because their predecessors in office acted in a manner

10 consistent with the powers accruing to that office. In civil

11 rights lawsuits, it is not the historical person, but the state

12 or municipal institution that is held responsible for the acts

13 of government officials. Because both the individuals occupying

14 the position of Governor of the State of Oklahoma and Chief of

15 Police of Tulsa in 1921 used the official power of their

16 positions to propagate the Riot and empower the rioting white

17 mob, the incumbents of these positions remain responsible for

18 the official acts carried out in the name of the Governor of the

19 State of Oklahoma and the Chief of Police. THE CITY OF TULSA and

20 THE CITY OF TULSA POLICE DEPARTMENT are also sued.

21

22                     B. Background of the Suit

23

24         12. Before the Civil War, Oklahoma was a territory in

25 which African Americans were held in slavery. After the war,

26

African Americans and others migrated to "the territory," seeking economic opportunity. Oklahoma was, in the words of Ralph Ellison, "a magnet for many individuals who had found disappointment in the older area of the country, white as well as black, but for Negroes it has a traditional association with freedom which had entered their folklore. Thus the uneducated and educated alike saw Oklahoma as a land of opportunity."[1]

13. Yet after Oklahoma gained statehood in 1907, African Americans faced increasing discrimination at the hands of white settlers. The legislature's first bill called for segregation on railroads. The state enacted restrictions on African Americans' voting rights and service on juries, and starting in the 1910's in Oklahoma, but continuing throughout the Jim Crow era,[2] municipalities promoted gross differentials in funding of white and separate, segregated schools. Twice during the decade of the 1910's the United States Supreme Court struck down Oklahoma legislation that discriminated on the basis of race: the first was the railroad segregation statute; the second

---

1. Going to the Territory, in The Collected Essays of Ralph Ellison 601 (John Callahan ed. 1995).
2. Jim Crow is the name historians give to the period between the end of Reconstruction and the New Deal, which was characterized by segregation laws. See C. Vann Woodward, The Strange Career of Jim Crow (3rd ed. 2002); Kenneth W. Mack, "Law, Society, Identity, and the Making of the Jim Crow South," 24 L. & Soc. Inquiry 377-409 (1999). Those laws typically provided for segregation on railroads, in schools, in housing, and in public accommodations. Reconstructing the Dreamland: The Tulsa Riot of 1921 79 (2002).

was the grandfather clause in voting registration.  Defendants,
the STATE OF OKLAHOMA and the CITY OF TULSA, however, persisted
in their racial discrimination.[3]

     14.  African Americans who violated the etiquette of
segregation were subjected to violence at the hands of the white
citizenry, on many occasions through the action or inaction of
the state.  Sometimes that violence took the form of riots, such
as an incident in Norman, Oklahoma, a small town that is now the
home of the University of Oklahoma.  In 1898, a white man
employed an African American construction worker.  A portion of
the white community, including Norman city officials, incensed
by the interracial workplace, severely injured the white man for
employing an African American.[4]

     15.  Also common at the time were what was known as
"nigger drives," to remove African Americans from cities.  After
African Americans were driven out, cities established informal
"sun down" laws.  They placed notices in prominent places
notifying African Americans that they could not remain in the
city after dark.  For example, in the early 1920s the signs in
Norman, Oklahoma, read, "Nigger, don't let the sun go down on

---

3. In a series of cases, the Oklahoma Supreme Court also upheld
differential funding of African American and white public
schools, and cities throughout the state passed zoning
ordinances requiring residential segregation.
4. See Wallace v. City of Norman, 60 P. 108 (Okla. Terr. 1900).

you in this town."[5]  At other times, the racial violence led to death by lynching: the Oklahoma State Legislature found that of the 24 individuals lynched in Oklahoma between 1911 and 1921, before 1921, 23 were African Americans.[6]  Months before the Riot, in August 1920, it was clear that the rule of law had broken down in the state.  Two men were lynched on the same weekend in Oklahoma: one — the only white man lynched during that period — was taken from the Tulsa jail and lynched in front of a crowd that included Tulsa police officers;[7] and the next day an African American man was taken from the Oklahoma City jail and lynched.[8]

16.  The African American community grew increasingly concerned over lynchings.  The August 1920 lynchings drove home a particularly important lesson: that no one was safe in the Tulsa jail and that the African American community was likely to be a continuing target of white mob violence.  The Tulsa Star, Greenwood's leading newspaper, editorialized about the Oklahoma City lynching that "While the boy was in jail . . . there was danger of mob violence."[9]  The possibility of another lynching was very real to African Americans in the Greenwood District of

---

5. Norman Mob After Singie Smith Jazz, Oklahoma City Black Dispatch (February 9, 1922).
6. See 74 Okl. St. Ann. §8000.1.1 (West 2002).
7. Governor Invokes Law Versus Mobbists, Tulsa Star (September 4, 1920).
8. Claude Chandler Hung By Mob, Posse Follows Too Late: Body Found West of City, Oklahoma City Black Dispatch (September 3, 1920).

Tulsa.  The Tulsa Race Riot, which began on May 31, 1921, and
lasted through the night into June 1, 1921, was precipitated by
the rumor of just such a lynching.


## C.  Basis of the Suit


17.  On the evening of May 31, 1921, a white mob, many
of whom were drunk, gathered in front of the Tulsa jail, and was
rumored to be preparing to lynch an African American man accused
of attempting to assault a white woman.  Some African American
men, including World War I veterans, came to the jail to prevent
the lynching.  During a mêlée between some of the white and
African American men, shots were fired and "all hell broke
loose."[10]  The Mayor of the CITY OF TULSA, acting under color of
law, called out local units of the State National Guard and,
with the assistance of the police chief of Tulsa, deputized and
armed some of the white citizens of Tulsa, many of whom were
part of the drunken mob.  The deputies were instructed to "go
get . . . a nigger."[11]  The deputized white citizens, acting
under color of law, terrorized and brutalized the African
American residents of Greenwood.

9. The Facts Remain the Same, Tulsa Star (September 18, 1920).
10. Alfred Brophy, Assessing State and City Culpability: The
Riot and the Law, published with Commission Report, 153, 156
(2001).
11. Dr. Scott Ellsworth, The Tulsa Race Riot, published with the

18. In the early hours of the morning of June 1, 1921, local units of the National Guard, along with the white Chief of Police and his deputies, removed the African American residents of Greenwood from their homes. The deputies and the white mob then looted the empty buildings before burning Greenwood to the ground. Defendants harnessed the latest techniques of modern warfare to put down what they considered a "Negro Uprising." Defendants or their agents deployed a machine gun to fire on African American residents of Greenwood. Defendants or their agents also used airplanes for reconnaissance of Greenwood. In addition, some eyewitnesses recall that one or more of the airplanes engaged in the attack by shooting at the African American Greenwood residents and dropping one or more incendiary devices. These acts resulted in the mass destruction of property located in Greenwood, as well as the unlawful killing of hundreds of African American residents of Greenwood. In the course of the Riot, Defendants unlawfully detained African American residents of Greenwood, forcing many of them to work in captivity.

19. The Riot, which occurred only sixty years after the end of de jure slavery in 1865, was part of a much larger culture of discrimination against African Americans, which was itself a legacy of slavery. Many of the Riot victims themselves

Commission Report, 37, 64 (2001).

1 had been slaves. Many whites explained the Riot as the result
2 of increasingly aggressive attitudes of African Americans, who
3 sought "social equality" following their service in World War I.
4 One African American property-owner was characterized as a man
5 who had "come back from the war in France with exaggerated ideas
6 about equality and thinking he can whip the world."[12]  The role
7 of the Riot in reducing the status of Tulsa's African American
8 community was told by one white newspaper: "The white citizens
9 of Tulsa have forgotten the bitter hatred and their desperation
10 that caused them to meet the negroes in battle to the death
11 Tuesday."[13]  Only once African Americans had been reduced to the
12 status of "helpless refugees," could they be seen as objects of
13 charity.[14]

14        20.  The claim that the Riot was an attempt to restore
15 segregation and hark back to the antebellum past was supported
16 by statements within the African American press as well.  The
17 Oklahoma City Black Dispatch observed after the Riot, that:

18
        "The old order changeth; no longer is the Negro
19      satisfied or clothed with the placidity of spirit of
        his slave parents.  We black men in Oklahoma know that
20      the legislature of this state tried to deprive us of
        our franchise when it enacted the 1916 Registration
21      act; we know that such a statute is in conflict with
        the Constitution of the United States and its
22

23 12. Negro Tells How Others Mobilized, Tulsa Tribune (June 4,
   1921).
24 13. To Rebuild Homes for Negro Owners and Probe Blame, Muskogee
   Phoenix (June 3, 1921)
25 14. Id.

26

interpretation by the Supreme Court. NO LONGER WILL WE BE SATISFIED WITH THE PIG TAILS OF CITIZENSHIP; we want to eat farther up on the body of the hog."[15]

21. Other whites linked the Riot to demands for equal treatment by people only recently removed from slavery. One white man wrote in the aftermath of the Riot, that "White adventurers trapped him in his native jungle only a few years ago; shipped him in chains to serve the white man in other lands; a stroke of political fortune makes him free and 'equal' to the white man in our country, and he has the consummate gall and impudence to want a place at the council board of the white man's civilization." A white Tulsa paper editorialized after the Riot about the consequences of slavery. "If those who invaded the shores of the Dark Continent for the purpose of securing slaves for the southern plantations of America could have foreseen the consequence of their acts it is certain the black man would never have been introduced to the United States."

22. In 1997, in an effort to end the "conspiracy of silence"[16] and to promote a discussion involving the whole community of the CITY OF TULSA and the STATE OF OKLAHOMA, Defendant the STATE OF OKLAHOMA itself commissioned a study to determine liability for the Riot and make recommendations for restitution for the Riot's victims. The resulting body, The

_____

15 An Inflammatory Appeal, <u>Black Dispatch</u> (October 15, 1920).

1  Oklahoma Commission to Study the Tulsa Race Riot of 1921

2  ("Commission"), ascertained the causes and consequences of the

3  Riot.  The Oklahoma State Legislature accepted those findings,[17]

4  which linked the Riot to racial violence throughout Oklahoma.

5  The Commission's findings determined that:

6
         "The root causes of the Tulsa Race Riot reside deep in
7         the history of race relations in Oklahoma and Tulsa
          which included the enactment of Jim Crow laws, acts of
8         racial violence (not the least of which was the 23
          lynchings of African-Americans versus only one white
9         from 1911) against African-Americans in Oklahoma, and
          other actions that had the effect of 'putting African-
10        Americans in Oklahoma in their place' and to prove to
          African-Americans that the forces supportive of
11        segregation possessed the power to 'push down, push
          out, and push under' African-Americans in Oklahoma."[18]
12

13        23.  In the aftermath of the Riot, Defendants the

14  STATE OF OKLAHOMA and the CITY OF TULSA impeded the Plaintiffs'

15  attempts to rebuild their lives.  Defendant the CITY OF TULSA

16  acted quickly to apply zoning restrictions to Greenwood that

17  rendered reconstruction of the destroyed dwellings prohibitively

18  expensive.  When the zoning regulations were declared unlawful,

19  Defendant the CITY OF TULSA refused to provide economic

20  compensation or to help the victims, many of whom remained

21  housed in tents through the fall and into the winter of 1921.

22

23
_____

24  16. Id. at §8000.1.5.
    17. See 74 Okl. St. Ann. §8000.1.
25  18. Id. at §8000.1.1.

26

1    24. Defendants the STATE OF OKLAHOMA and the CITY OF
2 TULSA acted quickly to suppress talk of the Riot and the
3 survivors' attempts to seek legal redress. Efforts to seek
4 relief from the court system were unsuccessful and futile.

5    25. Because of the Klan's influence throughout the
6 legal system, African American victims of the Riot quickly
7 learned that they could not count on the legal system for
8 restitution.[19] The Klan, already a feature of Oklahoma life
9 before the Riot, became entrenched at all levels of the Oklahoma
10 establishment in the months and years following the Riot.
11 Despite their best efforts to use the court system, African
12 Americans were subjected to discriminatory decision making
13 rather than justice. For example, a grand jury called to
14 determine the causes of the Riot issued indictments against a
15 large number of African Americans. Fearing this many of them
16 fled town. Defendant the CITY OF TULSA also refused to pay any
17 restitution to the African American survivors of the Riot: the
18 only restitution paid was to white gun-shop owners whose
19 business had been looted. While some African Americans filed
20 lawsuits at the time, over 100 of them were dismissed before
21 even receiving a hearing in Defendant the STATE OF OKLAHOMA's
22 courts.[20] Of the two cases that were heard by the Court, one,

23  _____

24 19. The Klan's influence also made legislative efforts to obtain
   restitution impossible.
25 20. Alfred Brophy, Reconstructing the Dreamland 95-97 (2002).

26

Draft G                          -19-                    COMPLAINT

1  filed by Mabel Allen, was dismissed before the jury
2  deliberated,[21] and the Oklahoma Supreme Court dismissed the other
3  on appeal.[22]

4        26.  Legal redress was also stymied by Oklahoma common
5  law doctrine which unconstitutionally limited municipal
6  liability.[23]  Precedent applied from Oklahoma's Territorial Court
7  made it difficult, if not impossible, for Riot victims to
8  sustain a claim against the CITY OF TULSA or its actors absent
9  ratification by the City Council.[24]

10       27.  The legislature of Defendant the STATE OF
11  OKLAHOMA adopted many of the Commission's findings by statute in
12  2001 and made specific reference to the "'conspiracy of silence'
13  surrounding the events in Tulsa of May 31-June 1, 1921, and
14  their aftermath."[25]  According to the legislature:

15       "Perhaps the most repugnant fact regarding the history
         of the 1921 Tulsa Race Riot is that it was virtually
16       forgotten, with the notable exception of those who
         witnessed it on both sides, for seventy-five (75)
17       years.  This 'conspiracy of silence' served the
         dominant interests of the state during that period
18       which found the riot a 'public relations nightmare'

19  _____

    21. Allen v. Tulsa, Tulsa County District Court, Case No.
20  16,013.
    22. See Redfearn v. American Central Insurance Company, 243 P.
21  929 (Okla. 1926).  See Alfred Brophy, Assessing State and City
    Culpability: The Riot and the Law, published with Commission
22  Report, 153, 157-58 (2001).
    23. See Alfred L. Brophy, The Tulsa Race Riot in the Oklahoma
23  Supreme Court, 54 Okla. L. Rev. 67 (2001).
    24. See Wallace v. City of Norman, 60 Pacific 108 (Okla. Terr.
24  1900).
    25. Id. at §8000.1.5.  See also Brent Staples, Unearthing a
25  Riot, NY Times, December 19, 1999, Section 6 at 64.

26  _____

that was 'best to be forgotten, something to be <u>swept</u> <u>well ber___h history's carpet'</u> for___ ̂ ̂community which attempteᴅ to attract new businesses and settlers."[26]

28.   In 1997, in an effort to end the "conspiracy of silence"[27] and to promote a discussion involving the whole community of the CITY OF TULSA and the STATE OF OKLAHOMA, Defendant the STATE OF OKLAHOMA created the Oklahoma Commission to Study the Tulsa Race Riot of 1921.  The Commission was designed to make whole a fractured community still suffering from the legacy of silence surrounding the Riots.  Specifically, the Commission was charged with:

> "undertak[ing] a study to develop a historical record of the 1921 Tulsa Race Riot including the identification of [any] person[ ] who:
> 1.   was an actual resident of the Greenwood area or community of the City of Tulsa on or about May 31, 1921, or June 1, 1921;  or
> 2.   sustained an identifiable loss to their person, personal relations, real property, personal property or other loss as a result of . . . the 1921 Tulsa Race Riot."[28]

29.   The Commission was empowered to "produce a written report of its findings and recommendations [for the Oklahoma legislature] . . . contain[ing] specific recommendations regarding whether or not reparations can or should be made and the appropriate methods to achieve the recommendations made in the final report," by February 28, 2001.

26. <u>Id.</u> at §8000.1.4 (emphasis added).
27. <u>Id.</u> at §8000.1.5.

1    30. The Commission found that, to this day, Oklahoma,
2  and in particular, Tulsa, remains racially divided. The
3  legislature, in adopting the Commission's findings recognized
4  that reconciliation begins through knowledge of the past,
5  followed by acceptance of the past, and finally atonement
6  through compensation to the survivors and their heirs. The
7  Commission drew upon testimony of a large number of Oklahomans,
8  both African American and white, in compiling its record. The
9  Defendants refuse to make restitution for their actions prior to
10  and during the Riot, and in perpetuating a "conspiracy of
11  silence"[29] after the Riot until the creation of the Commission
12  itself.

13    31. In the wake of its findings, "The
14  Commission . . . turned the responsibility for how the STATE OF
15  OKLAHOMA will respond to the historical record to the 48th
16  Oklahoma Legislature." 74 Okl. St. Ann. §8000.1.5 (West 2002).
17  The legislature found that:

18      "The documentation assembled by The 1921 Tulsa Race
        Riot Commission provides strong evidence that some
19      local municipal and county officials failed to take
        actions to calm or contain the situation once violence
20      erupted and, in some cases, became participants in the
        subsequent violence which took place on May 31 and
21      June 1, 1921, and even deputized and armed many whites
        who were part of a mob that killed, looted, and burned
22      down the Greenwood area."[30]

23

24  _____
    28. Id. at §8201.
25  29. Id. at §8000.1.5.

26

"The staggering cost of the Tulsa Race Riot included the death of an estimated 100 to ⌢ persons, the vast majority of whom were African-Americans, the destruction of 1,256 homes, virtually every school, church and business, and a library and hospital in the Greenwood area, and the loss of personal property caused by rampant looting by white rioters. The Tulsa Race Riot Commission estimates that the property costs in the Greenwood district was approximately $2 million in 1921 dollars or $16,752,600 in 1999 dollars. Nevertheless, there were no convictions for any of the violent acts against African-Americans or any insurance payments to African-American property owners who lost their homes or personal property as a result of the Tulsa Race Riot. Moreover, local officials attempted to block the rebuilding of the Greenwood community by amending the Tulsa building code to require the use of fire-proof material in rebuilding the area thereby making the costs prohibitively expensive."[32]

"The 48th Oklahoma Legislature in enacting the 1921 Tulsa Race Riot Reconciliation Act of 2001 concurs with the conclusion of The 1921 Tulsa Race Riot Commission . . . . [T]his response recognizes that there were moral responsibilities at the time of the riot which were ignored and has been ignored ever since rather than confront the realities of an Oklahoma history of race relations that allowed one race to 'put down' another race. Therefore, it is the intention of the Oklahoma Legislature in enacting the 1921 Tulsa Race Riot Reconciliation Act of 2001 to freely acknowledge its moral responsibility on behalf of the state of Oklahoma and its citizens that no race of citizens in Oklahoma has the right or power to subordinate another race today or ever again."[32]

32. The STATE OF OKLAHOMA and the CITY OF TULSA empowered, encouraged, and furthered the illegal brutalization of African Americans by whites during and after the race Riot.

30. Id. at §8000.1.2 (emphasis added).
31. Id. at §8000.1.3 (emphasis added).

1 From Defendants' acceptance of their moral responsibility to
2 atone for these acts logically flows the obligation that they
3 accept their legal responsibility as well.

4     33.   The conspiracy of silence fell particularly hard
5 on the African American citizens of Oklahoma.  African Americans
6 were not allowed to speak of their experiences,[33] and were not
7 believed when they did.  Many of the survivors and their
8 families suffered a deep psychological scarring, as one of the
9 purposes of the Riot and its aftermath — which lingers to this
10 day throughout the African American community in Tulsa — was to
11 diminish the sense of security of Greenwood African Americans,
12 to place them in a subservient condition, and to enforce a
13 racial caste system that privileged whites and disadvantaged and
14 demeaned African Americans.  Many of the Riot survivors are
15 still hesitant to talk about the events surrounding the Riot and
16 its aftermath.  Many of them still believe that the state and
17 municipal government will punish them for discussing openly what
18 happened during the Riot.

19     34.   According to the Report of the Oklahoma
20 Commission to Study the Tulsa Race Riot of 1921 ("Commission
21
22 _____

23 32. Id.
    33. See John Hope Franklin and Scott Ellsworth, History Knows No
       Fences: An Overview, published with the Commission Report 21,
24  26-28 (2001) (discussing suppression of discussion of Riot).
       See also Brent Staples, Unearthing a Riot, NY Times, December
25  19, 1999, Section 6 at 64 (same).

26

1  Report"), "The 1921 riot is, at once, a representative
2  historical example and a unique historical event. It has many
3  parallels in the pattern of past events, but it has no equal for
4  its violence and its completeness."[34]

5       35.  The Commission was formed with the intent of
6  determining the causes of and liabilities for the 1921 Tulsa
7  Riot. The survivors were led to expect that the STATE OF
8  OKLAHOMA and CITY OF TULSA would abide by the findings of the
9  Commission. Instead, it appears that despite the concurrence in
10 and acknowledgment of the facts establishing their complicity in
11 the Riot and its consequences, the state and municipality have
12 decided to wait for the survivors, all of them in excess of
13 eighty-years-old, to die off so that the problem will "silently"
14 pass away.

15      36.  Defendants continue to fail to abide by the
16 recommendation of the Commission, and refuse to provide redress
17 to the Plaintiffs who are direct victims of a Riot that killed
18 between 100-300 African American men, women, and children, and
19 resulted in the looting and destruction of their property.

20      37.  Plaintiffs also seek to establish an educational
21 fund[35] for the Greenwood District of Tulsa to ensure that the

22

23 34. Commission Report at 19.
   35. The Tulsa Reconciliation Education and Scholarship Program
24 ("TRESP") established by 70 Okl. St. Ann. §2621 (West 2002) has
   never been properly funded. At the very least, plaintiffs seek
25 to require the State to adequately fund the TRESP, as required

26

STATE OF OKLAHOMA and the CITY OF TULSA can come together as a community united, with the common goal of promoting racial reconciliation and understanding. For too long, Defendants have silenced Plaintiffs and discounted their testimony. In so doing, Defendants have only perpetuated the divisions that were solidified during and after the Riot. Education about the past must be coupled with restitution or reparations to enable the community to move forward, together, in the common purpose of bettering the lives of all the citizens of Oklahoma.

<div align="center">THE PARTIES</div>

<div align="center">A.   Plaintiffs</div>

<div align="center">i   Survivors</div>

38.   Plaintiffs file this action against THE GOVERNOR OF THE STATE OF OKLAHOMA (in his official capacity); THE CITY OF TULSA; THE CHIEF OF POLICE OF THE CITY OF TULSA; and THE CITY OF TULSA POLICE DEPARTMENT.

39.   Plaintiff JOHN MELVIN ALEXANDER is an individual residing in the State of Oklahoma. Plaintiff was born on December 22, 1919. At the time of the Riot, Plaintiff lived at 1621 North Norfolk Street in the Greenwood District of Tulsa. During the Riot, the rioting white mob took Plaintiff's father to the Ball Park holding camp; Plaintiff was unlawfully detained

by 70 Okl. St. Ann. §§2620-2627.

1 against his will in Brady Theater detention center. Plaintiff
2 went on to fight for the United States in WWII & Korea. As
3 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
4 §8205 (West 2000)), the Executive Director of the Oklahoma
5 Historical Society has certified that Plaintiff is a Riot
6 Survivor.

7 40. Plaintiff JUANITA DELORES BURNETT ARNOLD is an
8 individual residing in the State of Oklahoma. Plaintiff was
9 born on July 27, 1909. At the time of the Riot, Plaintiff lived
10 at 1000 N. Lansing Street in the Greenwood District of Tulsa.
11 During the Riot, Plaintiff fled from the rioting white mob with
12 her mother and father. As required by the Oklahoma State
13 Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
14 Executive Director of the Oklahoma Historical Society has
15 certified that Plaintiff is a Riot Survivor.

16 41. Plaintiff J.B. BATES is an individual residing in
17 the State of Oklahoma. Plaintiff was born on June 13, 1916. At
18 the time of the Riot, Plaintiff lived between Greenwood and
19 Marshall Street in the Greenwood District of Tulsa. Plaintiff's
20 grandfather died during the Riot. Plaintiff's property was
21 destroyed during the Riot, although the rioting white mob did not
22 burn down his family home. Plaintiff and his parents had to
23 leave their house and stay with relatives in Tulsa and were
24 unable to return to their home until at least two week after the
25 Riot. As required by the Oklahoma State Legislature (74 Okl.

26

1 Stat. Ann. §8205 (West 2000)), the Executive Director of the
2 Oklahoma Historical Society has certified that Plaintiff is a
3 Riot Survivor.

4     42.   Plaintiff ESSIE LEE JOHNSON BECK is an individual
5 residing in the State of Oklahoma.  Plaintiff was born on April
6 29, 1915.  Plaintiffs property was destroyed during the Riot.  At
7 the time of the Riot, Plaintiff lived in the Greenwood District
8 of Tulsa. As required by the Oklahoma State Legislature (74 Okl.
9 Stat. Ann. §8205 (West 2000)), the Executive Director of the
10 Oklahoma Historical Society has certified that Plaintiff is a
11 Riot Survivor.

12     43.   Plaintiff THELMA DUNN BEDELL is an individual
13 residing in the State of Missouri. Plaintiff was born on May 18,
14 1919.  At the time of the Riot, Plaintiff lived at 1027 N.
15 Kenosha Street in the Greenwood District of Tulsa.  Plaintiff is
16 sister to plaintiff VERNICE DUNN SIMMS.  Plaintiffs escaped from
17 their home while bullets fired by the rioting white mob hit the
18 roof and side of the house during the Riot.  She and her sister
19 helped out in the segregated hospital tending to African
20 American men, women, and children shot during the Riot.  As
21 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
22 §8205 (West 2000)), the Executive Director of the Oklahoma
23 Historical Society has certified that Plaintiff is a Riot
24 Survivor.

25

26

1              44.  Plaintiff JAMES D. BELL is an individual residing

2 in the State of Oklahoma.  Plaintiff was born on June 12, 1921.

3 At the time of the Riot, Plaintiff lived at 418 N. Cincinnati

4 Avenue in the Greenwood District of Tulsa.  Plaintiff was born

5 prematurely as a result of the shock his mother suffered during

6 the Riot.  Plaintiff's property was destroyed during the Riot,

7 including his family home.  As required by the Oklahoma State

8 Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the

9 Executive Director of the Oklahoma Historical Society has

10 certified that Plaintiff is a Riot Survivor.

11              45.  Plaintiff PHINES BELL is an individual residing in

12 the State of Washington.  Plaintiff was born on August 16, 1918.

13 At the time of the Riot, Plaintiff lived in the Greenwood

14 District of Tulsa. Plaintiff suffered property damage during the

15 Riot.  As required by the Oklahoma State Legislature (74 Okl.

16 Stat. Ann. §8205 (West 2000)), the Executive Director of the

17 Oklahoma Historical Society has certified that Plaintiff is a

18 Riot Survivor.

19              46.  Plaintiff FRANCES BLACKWELL is an individual

20 residing in the State of Oklahoma.  Plaintiff was born on

21 February 12, 1913.  At the time of the Riot, Plaintiff lived in

22 the Greenwood District of Tulsa.  The rioting white mob forced

23 Plaintiff to flee her home for several days to avoid capture by

24 Defendant's agents.  As required by the Oklahoma State

25 Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive

26

1  Director of the Oklahoma Historical Society has certified that

2  Plaintiff is a Riot Survivor.

3  47.  Plaintiff JUANITA WILLIAMS BLAKELY is an

4  individual residing in the State of Oklahoma.  Plaintiff was

5  born on August 5, 1914.  Plaintiff resided at Frankfort Place,

6  one block from Greenwood.  Plaintiff's family property was

7  destroyed during the Riot.  Plaintiff hid under the bed when

8  members of the rioting white mob entered her house and sent fire

9  to the curtains.  Plaintiffs and family fled from the burning

10 house and saw airplanes over Greenwood and Archer dropping

11 incendiary devices.  Plaintiff's mother found a relative to take

12 Plaintiff to Gerard, Kansas while Plaintiff's mother remained in

13 Tulsa and was detained at the Fairgrounds.  Plaintiff's home was

14 destroyed in the fire.  Plaintiff's uncle, Osborne Monroe, owned

15 a skating rink and a boarding house, both of which were

16 destroyed in the Riot.

17 48.  Plaintiff JUANITA SMITH BOOKER is an individual

18 residing in the State of Oklahoma.  Plaintiff was born on January

19 15, 1914.  At the time of the Riot, Plaintiff lived on Archer

20 Street in the Greenwood District of Tulsa. Plaintiff's property

21 was destroyed during the Riot.  The rioting white mob burned her

22 family home to the ground and destroyed it completely with the

23 exception of an upright victrola, which was the only item of

24 personal property the family managed to salvage after the Riot.

25 Plaintiff and her family were temporarily housed at the former

26

Booker T. Washington School after the Riot.  As required by the
Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
2000)), the Executive Director of the Oklahoma Historical Society
has certified that Plaintiff is a Riot Survivor.

49.   Plaintiff KINNEY BOOKER is an individual residing
in the State of Oklahoma. Plaintiff was born on March 21, 1913.
At the time of the Riot, Plaintiff lived at 320 North Hartford
Street in the Greenwood District of Tulsa.   During the Riot, he
hid in an attic while the white rioters set fire to his home.
Plaintiff's family property was destroyed during the Riot.
Plaintiff was forced to flee her house by the rioting white mob.
He was lucky to escape before it burned to the ground. Plaintiff
was unlawfully detained against his will at the Convention Hall
detention center.  As required by the Oklahoma State Legislature
(74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director
of the Oklahoma Historical Society has certified that Plaintiff
is a Riot Survivor.

50.   Plaintiff DOROTHY BOOKER BOULDING is an individual
residing in the State of Missouri. Plaintiff was born on December
2, 1915.  At the time of the Riot, Plaintiff lived in the
Greenwood District of Tulsa.  Plaintiff is the sister of
Plaintiff KINNEY BOOKER.  Plaintiff suffered property damage
during the Riot.  Plaintiff was forced to flee her house by the
rioting white mob.  Plaintiff was unlawfully detained against her
will in one of the detention centers.  As required by the

1  Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
2  2000)), the Executive Director of the Oklahoma Historical Society
3  has certified that Plaintiff is a Riot Survivor.

4      51.  Plaintiff JEANETTE McNEAL BRADSHAW is an
5  individual residing in the State of Illinois. Plaintiff was born
6  on June 28, 1918. At the time of the Riot, Plaintiff lived at
7  911 Fairview Street in the Greenwood District of Tulsa.
8  Plaintiff is the sister of Plaintiff Plaintiff THERESSA CORNELLA
9  McNEAL GILLIAM. Plaintiffs' mother was a prominent business
10 woman, owning a boarding house and working as a dressmaker with a
11 large inventory of fabric and dresses. Plaintiff's family
12 property was destroyed during the Riot. The business and its
13 stock was completely lost during the Riot. As required by the
14 Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
15 2000)), the Executive Director of the Oklahoma Historical Society
16 has certified that Plaintiff is a Riot Survivor.

17     52.  Plaintiff TERESA EARLEE BRIDGES DYSART is an
18 individual residing in the State of Texas. Plaintiff was born on
19 December 11, 1917. At the time of the Riot, Plaintiff lived at
20 514 N. Hartford in the Greenwood District of Tulsa. Plaintiff's
21 family property was destroyed during the Riot, including two
22 pianos and an organ, some hand-made Indian jewelry, and a Rooflee
23 model car. As required by the Oklahoma State Legislature (74
24 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the
25
26

Oklahoma Historical Society has certified that Plaintiff is a
Riot Survivor.

53. Plaintiff JOHNNIE L. GRAYSON BROWN is an individual residing in the State of Oklahoma. Plaintiff was born on July 5, 1914. At the time of the Riot, Plaintiff lived at 31 N. Kenosha Street in the Greenwood District of Tulsa with her family. Plaintiff's family property was destroyed during the Riot. The rioting white mob ransacked her home. Plaintiff, along with her aunt, Corene Grayson Edwards, was unlawfully detained against her will at the Fairground detention center for several days. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

54. Plaintiff CLARENCE BRUNER is an individual residing in the State of Oklahoma. Plaintiff was born on July 28, 1904. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

55. Plaintiff LULA BELLE LACY BULLOCK is an individual residing in the State of Missouri. Plaintiff was born on April 22, 1920. At the time of the Riot, Plaintiff lived in Bullette Street in the Greenwood District of Tulsa. Plaintiff

1 is sister of Plaintiff ARTIE LACY JOHNSON. Plaintiffs fled the
2 Rioting white mob. Plaintiffs' property was destroyed during
3 the Riot: their family store and home were burned down. As
4 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
5 §8205 (West 2000)), the Executive Director of the Oklahoma
6 Historical Society has certified that Plaintiff is a Riot
7 Survivor.

8      56. Plaintiff JOE R. BURNS is an individual residing
9 in the State of Oklahoma. Plaintiff was born on February 5,
10 1915. At the time of the Riot, Plaintiff lived at 517 Latimer
11 Court in the Greenwood District of Tulsa. Plaintiff fled with
12 his father and mother to Mohawk Park, hiding in the shrubs and
13 trees in the creek. His family was later captured and placed in
14 detention centers. Plaintiff was unlawfully detained against
15 his will in the Convention Center detention center. As required
16 by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205
17 (West 2000)), the Executive Director of the Oklahoma Historical
18 Society has certified that Plaintiff is a Riot Survivor.

19      57. Plaintiff ROSA L. GREEN BYNUM is an individual
20 residing in the state of Maryland. Plaintiff was born on August
21 14, 1920. At the time of the Riot, Plaintiff lived on N.
22 Detroit Street. Plaintiff's family property was destroyed.
23 Plaintiff and her family where held in detention with other
24 families for several days. Plaintiff was unlawfully detained
25 against her will in one of the detention centers.

26

58. Plaintiff MURIEL MIGNON LILLY CABELL is an individual residing in the State of California. Plaintiff was born on December 29, 1913. At the time of the Riot, Plaintiff lived on Elgin Street in the Greenwood District of Tulsa. Plaintiff is the sister of Plaintiffs HATTIE LILLY DUNN and JIMMIE LILLY FRANKLIN. Plaintiffs' parents owned a home with four bedrooms, one bathroom, a living room, a dining room, and an office used by their father, who was a photographer. Their father had a photographic studio, a dark room, and several large cameras, and also owned a Ford Sedan. Plaintiffs' uncle, Fred Wells, was a prominent Tulsa physician and surgeon, who owned a Ford Coupe and medical equipment. Plaintiff's family property was destroyed during the Riot. Their home was the third house burned during the Riot. The rioting white mob destroyed their home and all their family's possessions. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §§205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

59. Plaintiff BEATRICE CAMPBELL-WEBSTER is an individual residing in the State of California. Plaintiff was born on March 5, 1914. At the time of the Riot, Plaintiff lived with her family at 906 N. Latimer Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. Plaintiff lost her home and furnishings, including a piano and a victrola, leather couches and chairs, and

miscellaneous other possessions. Plaintiff fled her home to avoid the rioting white mob. Plaintiff was unlawfully detained against her will in one of the detention centers. Plaintiff escaped with her family to Alsuma, a nearby town, where the National Guard captured them. Her father was sent to the Ball Park detention center, and the rest of the family was sent to the Convention Hall detention center. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

60. Plaintiff JAMES DALE CARTER is an individual residing in the State of Missouri. Plaintiff was born on November 26, 1920. Plaintiff is the son of Plaintiff ROSELLA CARTER. Plaintiff resided on Greenwood at the time of the Riot. Plaintiff's property was destroyed during the course of the Riot and Plaintiff's fled from the rioting white mob, his mother carrying him forty miles on her back to safety.

61. Plaintiff ROSELLA CARTER is an individual residing in the State of Missouri. Plaintiff was born on June 20, 1900. Plaintiff is the mother of Plaintiff JAMES DALE CARTER. Plaintiff resided on Greenwood at the time of the Riot. Plaintiff's property was destroyed during the course of the Riot and Plaintiff's fled from the rioting white mob, carrying her son on her back forty miles to escape to safety.

62.    Plaintiff SAMUEL CASSIUS is an individual residing in the State of New Jersey. Plaintiff was born on May 2, 1921. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

63.    Plaintiff NAOMI HOOKER CHAMBERLAIN is an individual residing in the State of New York. Plaintiff was born on January 26, 1918. At the time of the Riot, Plaintiff lived on Independence Street in a house valued at $10,000 in 1921 dollars. Her parents also owned a large store at 123 N. Greenwood Avenue in the Greenwood District of Tulsa. Plaintiff is the sister of Plaintiffs DR. OLIVIA J. HOOKER and SAMUEL L. HOOKER. Plaintiff's family property was destroyed during the Riot.    White rioters damaged Plaintiffs' home during the Riot, and the rioting white mob completely destroyed Plaintiffs' parents' business, which was described as "a total loss."  The estimated value of the goods destroyed amounted to $100,000 in 1921 dollars.    Plaintiffs' father filed a lawsuit against the insurance company for the value of the destroyed property, but the case was thrown out in 1926 or 1927. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

1    64.   Plaintiff MILDRED MITCHELL CHRISTOPHER is an
2 individual residing in the State of Florida.  Plaintiff was born
3 on October 19, 1913.  At the time of the Riot, Plaintiff lived
4 on King Street in the Greenwood District of Tulsa.  Plaintiff's
5 property was destroyed during the Riot: her home was burned and
6 property was taken from the house including a piano and silver
7 flatware.  Plaintiff fled to Broken Arrow, Oklahoma with
8 plaintiff's mother and sisters.  Plaintiff stayed in an
9 abandoned stone house in Broken Arrow with other families
10 fleeing the Riot for several days until the National Guard and
11 the Red Cross located them.  Plaintiff and her family were
12 unlawfully detained against their will in the Fairground
13 detention center until her mother's employer "claimed" them.  As
14 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
15 §8205 (West 2000)), the Executive Director of the Oklahoma
16 Historical Society has certified that Plaintiff is a Riot
17 Survivor.

18    65.   Plaintiff MILDRED LUCAS CLARK is an individual
19 residing in the State of Arkansas.  Plaintiff was born October
20 15, 1921, four months after the Riot.  Plaintiff's mother
21 resided at 1012 N. Elgin at the time of the Riot.  Plaintiff's
22 mother fled to the home of white neighbors to escape the Riot
23 and later was held at the Convention Center for several days.
24 Plaintiff's family property was destroyed during the Riot.
25 Plaintiff's mother died shortly after the birth of Plaintiff due

26

1  to the poor living conditions for Greenwood residents after the
2  Riot.

3      66.  Plaintiff OTIS GRANVILLE CLARK is an individual
4  residing in the State of Oklahoma. Plaintiff was born on
5  February 13, 1903.  At the time of the Riot, Plaintiff lived at
6  805 E.  Archer Street in the Greenwood District of Tulsa.
7  During the Riot, Plaintiff was caught in the middle of a gun
8  battle. He was sprayed with blood when his friend was shot
9  through the hand by a white sniper, and both of them fled for
10  their lives.  His cousin's café was burned to the ground.  His
11  stepfather disappeared during the Riot and was never seen again.
12  Plaintiff's family property was destroyed during the Riot.  His
13  home was burned to the ground.  As required by the Oklahoma
14  State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
15  Executive Director of the Oklahoma Historical Society has
16  certified that Plaintiff is a Riot Survivor.

17      67.  Plaintiff SANDY CLARK is an individual residing
18  in the State of Oklahoma.  Plaintiff was born in 1907.  At the
19  time of the Riot, Plaintiff lived in the Greenwood District of
20  Tulsa.  As required by the Oklahoma State Legislature (74 Okl.
21  Stat. Ann. §8205 (West 2000)), the Executive Director of the
22  Oklahoma Historical Society has certified that Plaintiff is a
23  Riot Survivor.

24      68.  Plaintiff BLANCHE CHATMAN COLE is an individual
25  residing in the State of Oklahoma. Plaintiff was born on April

26

21, 1904.  At the time of the Riot, Plaintiff lived in a rented home in the Greenwood District of Tulsa.  During the Riot, her family fled to Clarksville, Oklahoma. Plaintiff's family property was destroyed during the Riot.  All the family's belongings were burned or stolen during the Riot.  As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

69.  Plaintiff WORDIE "PEACHES" MILLER COOPER is an individual residing in the State of Oklahoma.  Plaintiff was born on February 4, 1911.  At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa.  As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

70.  Plaintiff CARRIE HUMPHREY CUDJOE is an individual residing in the State of Oklahoma. Plaintiff was born on April 6, 1921.  At the time of the Riot, Plaintiff lived at 1211 N. Lansing Street in the Greenwood District of Tulsa.  Plaintiff's parents owned their own home, a horse, a cow, some chickens, and miscellaneous furnishings and other items. Plaintiff's family property was destroyed during the Riot.  Their home was burned down during the Riot, and all of Plaintiff's family's possessions were destroyed or stolen.  Plaintiff and her family were unlawfully detained against their will in one of the

detention centers.  Plaintiff, her mother and brother fled to
Mohawk Park on foot where the National Guard picked them up and
took them to a church at Seventh Avenue and Boston Street.
State and municipal officials held Plaintiff, her mother, and
her brother at the Church for three days. Plaintiff and suffered
physical injury during the Riot.  Both of them injured their
feet while fleeing the white mob.  As required by the Oklahoma
State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
Executive Director of the Oklahoma Historical Society has
certified that Plaintiff is a Riot Survivor.

71.  Plaintiff LaVERNE COOKSEY DAVIS is an individual
residing in the State of Oklahoma.  Plaintiff was born on May 24,
1904.  At the time of the Riot, Plaintiff lived in South Tulsa,
which was a white district of Tulsa.  Plaintiff witnessed the
burning of Greenwood.  As required by the Oklahoma State
Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
Executive Director of the Oklahoma Historical Society has
certified that Plaintiff is a Riot Survivor.

72.  Plaintiff HATTIE LILLY DUNN is an individual
residing in the State of California. Plaintiff was born on March
16, 1918.  At the time of the Riot, Plaintiff lived on Elgin
Street in the Greenwood District of Tulsa.  Plaintiff is the
sister of Plaintiffs MURIEL MIGNON LILLY CABELL and JIMMIE LILLY
FRANKLIN. Plaintiff's family property was destroyed during the
Riot.  The rioting white mob destroyed their home.  As required

by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

73. Plaintiff JAMES DURANT is an individual residing in the State of Michigan. Plaintiff was born on January 27, 1915. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. Plaintiff suffered property damage during the Riot: his family home was burned to the ground. Plaintiff was forced to flee his house by the rioting white mob. Plaintiff was physically injured during the Riot. Members of the rioting white mob attacked him. Plaintiff fled from the rioting white mob and hid in a bus with other Greenwood residents. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

74. Plaintiff LUCILLE B. BUCHANAN FIGURES is an individual residing in the State of Oklahoma. Plaintiff was born on January 9, 1909. At the time of the Riot, Plaintiff lived at 521 N. Elgin Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. Plaintiff's property was destroyed during the Riot, including her family home. Plaintiff and her mother were unlawfully detained against their will in one of the detention centers until her mother's white employer "claimed" them from the

1  detention center. As required by the Oklahoma State Legislature
2  (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director
3  of the Oklahoma Historical Society has certified that Plaintiff
4  is a Riot Survivor.

5      75. Plaintiff ARCHIE JACKSON FRANKLIN is an
6  individual residing in the State of California. Plaintiff was
7  born on November 11, 1915. At the time of the Riot, Plaintiff
8  lived in the Greenwood District of Tulsa. Plaintiff is the
9  brother of Plaintiff HAZEL FRANKLIN HACKETT. Plaintiff's
10 property was destroyed during the Riot, including her family
11 home. As required by the Oklahoma State Legislature (74 Okl.
12 Stat. Ann. §8205 (West 2000)), the Executive Director of the
13 Oklahoma Historical Society has certified that Plaintiff is a
14 Riot Survivor.

15     76. Plaintiff JIMMIE LILLY FRANKLIN is an individual
16 residing in the State of California. Plaintiff was born on June
17 12, 1916. At the time of the Riot, Plaintiff lived on Elgin
18 Street in the Greenwood District of Tulsa. Plaintiff is the
19 sister of Plaintiffs MURIEL MIGNON LILLY CABELL and HATTIE LILLY
20 DUNN. Plaintiff's family property was destroyed during the Riot.
21 The rioting white mob destroyed their home. As required by the
22 Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
23 2000)), the Executive Director of the Oklahoma Historical Society
24 has certified that Plaintiff is a Riot Survivor.

25

26

77. Plaintiff JOAN HILL GAMBREL is an individual residing in the State of New Jersey. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

78. Plaintiff ERNESTINE GIBBS is an individual residing in the State of Oklahoma. Plaintiff was born on December 15, 1902. At the time of the Riot, Plaintiff lived on King Street, in the middle of a train track area. Plaintiff fled from her home to avoid the rioting white mob. Her home was destroyed, along with all the family's possessions, during the Riot. Plaintiff was unlawfully detained against her will at the Fairground detention center. Plaintiff's family property was destroyed during the Riot. Plaintiff's brother, along with many other African American men, only evaded the rioting white mob by jumping into a river and swimming to freedom. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

79. Plaintiff HAROLD GIBBS is an individual residing in the State of Oklahoma. Plaintiff was born on January 16, 1920. At the time of the Riot, Plaintiff lived on Jasper Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot, including his father's wagon and

two horses. Plaintiff and his mother were unlawfully detained against their will in a detention center. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

80. Plaintiff MARGARET TILLEY GIBBS is an individual residing in the State of Oklahoma. Plaintiff was born on January 16, 1920. At the time of the Riot, Plaintiff lived near Jasper Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot.

81. Plaintiff THERESSA CORNELLA McNEAL GILLIAM is an individual residing in the State of Illinois. Plaintiff was born on October 11, 1911. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa with her family. Plaintiff is the sister of Plaintiff JEANEATTE MCNEAL BRADSHAW. Plaintiff's family property was destroyed during the Riot. Their mother's boarding house and dressmaking business were completely destroyed during the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

82. Plaintiff LEON GRAYS, SR. is an individual residing in the State of California. Plaintiff was born on August 5, 1915. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. Plaintiff's family property was

destroyed during the Riot, including all their furnishings and a
wagon with some tools during the Riot. Plaintiff was forced to
flee from the rioting white mob. Plaintiff's family moved to
Muskogee to escape the racial tensions in Tulsa. As required by
the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
2000)), the Executive Director of the Oklahoma Historical Society
has certified that Plaintiff is a Riot Survivor.

83. Plaintiff HAZEL FRANKLIN HACKETT is an individual
residing in the State of Alabama. Plaintiff was born on October
11, 1918. At the time of the Riot, Plaintiff lived at 604 E.
Independence Place in the Greenwood District of Tulsa. Plaintiff
is the sister of Plaintiff ARCHIE JACKSON FRANKLIN. Plaintiff's
family property was destroyed during the Riot. During the Riot,
rioting white mob burned down Plaintiff's family's home and
destroyed all the family's possessions. Plaintiff was
unlawfully detained against her will for three days at the
Fairground detention center. Plaintiff was father's employer
"claimed" Plaintiff's father from the detention center. As
required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
§8205 (West 2000)), the Executive Director of the Oklahoma
Historical Society has certified that Plaintiff is a Riot
Survivor.

84. Plaintiff MILDRED JOHNSON HALL is an individual
residing in the State of California. Plaintiff was born on
October 17, 1919. At the time of the Riot, Plaintiff lived in

the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. Plaintiff's family was buying a home in Greenwood that was destroyed by the white mob during the Riot. Plaintiff's mother died months after the Riot from tuberculosis and pneumonia resulting from her stay, during the fall and winter of 1921, in the municipal tents erected after the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

85. Plaintiff NELL HAMILTON HAMPTON is an individual residing in the State of Oklahoma. Plaintiff was born on March 4, 1911. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. Plaintiff was forced to flee her home by the rioting white mob. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

86. Plaintiff LEROY LEON HATCHER is an individual residing in the State of Oklahoma. Plaintiff was born on May 23, 1921. At the time of the Riot, Plaintiff lived near Brady Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. The rioting white mob killed Plaintiff's father and burned down their home. Plaintiff's mother carried him nine miles in an effort to avoid

the rioting white mob. As required by the Oklahoma State
Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
Executive Director of the Oklahoma Historical Society has
certified that Plaintiff is a Riot Survivor.

87. Plaintiff MADELEINE HAYNES is an individual
residing in the State of California. Plaintiff was born on June
7, 1912. At the time of the Riot, Plaintiff lived at 544 E.
Pine Street in the Greenwood District of Tulsa. Plaintiff's
family property was destroyed during the Riot. The rioting
white mob burned down Plaintiff's family's home. Plaintiff was
detained against her will in one of the detention centers.
National Guardsmen took Plaintiff and her family into custody
and transported Plaintiff, her sister, and her mother to the
Ball Park detention center. As required by the Oklahoma State
Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
Executive Director of the Oklahoma Historical Society has
certified that Plaintiff is a Riot Survivor.

88. Plaintiff JAMES FRISSELL "BOTTLEHEAD" HILL is an
individual residing in the State of California. Plaintiff was
born on October 25, 1919. At the time of the Riot, Plaintiff
lived at 441 E. Latimer Street in the Greenwood District of
Tulsa. Plaintiff's family property was destroyed during the Riot.
The rioting white mob destroyed all of Plaintiff's family's
property. Plaintiff later saw active service in the United
States Military during World War II. As required by the Oklahoma

1  State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
2  Executive Director of the Oklahoma Historical Society has
3  certified that Plaintiff is a Riot Survivor.

4      89.  Plaintiff JOYCE WALKER HILL is an individual
5  residing in the State of Kansas. Plaintiff was born on December
6  18, 1908.  At the time of the Riot, Plaintiff lived at 322 N.
7  Frankfort in the Greenwood District of Tulsa. Plaintiff is the
8  sister of Plaintiffs SAMUEL WALKER and TROY SIDNEY WALKER.
9  Plaintiff's family property was destroyed during the Riot.  The
10  rioting white mob destroyed Plaintiff's family home, which was a
11  two-story, eight-room house.  Plaintiff's family also ran a
12  restaurant business.  By the time Plaintiff escaped from the
13  rioting white mob, both her feet were bloody from running
14  barefoot along the gravel railroad tracks.  As required by the
15  Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
16  2000)), the Executive Director of the Oklahoma Historical
17  Society has certified that Plaintiff is a Riot Survivor.

18      90.  Plaintiff DR. OLIVIA J. HOOKER is an individual
19  residing in the State of New York. Plaintiff was born on
20  February 12, 1915.  At the time of the Riot, Plaintiff lived on
21  Independence Street in the Greenwood District of Tulsa.
22  Plaintiff is the sister of Plaintiffs NAOMI HOOKER CHAMBERLAIN
23  and SAMUEL L. HOOKER. Plaintiff's family property was destroyed
24  during the Riot, including their home and business.  As required
25  by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205

26

(West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

91. Plaintiff SAMUEL L. HOOKER, JR. is an individual residing in the State of Illinois. Plaintiff was born on January 6, 1918. At the time of the Riot, Plaintiff lived on Independence Street in the Greenwood District of Tulsa. Plaintiff is the brother of Plaintiffs NAOMI HOOKER CHAMBERLAIN and DR. OLIVIA J. HOOKER. Plaintiff's family property was destroyed during the Riot, including their home and business. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

92. Plaintiff WILHELMINA GUESS HOWELL is an individual residing in the State of Oklahoma. Plaintiff was born on April 25, 1907. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. The rioting white mob killed Plaintiff's uncle. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

93. Plaintiff CHARLES HUGHES is an individual residing in the State of Michigan. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required

1  by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205

2  (West 2000)), the Executive Director of the Oklahoma Historical

3  Society has certified that Plaintiff is a Riot Survivor.

4       94.  Plaintiff MYRTLE WELLS HURD is an individual

5  residing in the State of Oklahoma.  At the time of the Riot,

6  Plaintiff lived in the Greenwood District of Tulsa.  As required

7  by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West

8  2000)), the Executive Director of the Oklahoma Historical Society

9  has certified that Plaintiff is a Riot Survivor.

10      95.  Plaintiff VERA INGRAM is an individual residing

11  in the State of Oklahoma.  Plaintiff was born on March 4, 1914.

12  At the time of the Riot, Plaintiff lived at 1342 N. Lansing

13  Avenue in the Greenwood District of Tulsa.  Plaintiff's family

14  property was destroyed during the Riot.  Plaintiff's family fled

15  to Mowhawk Park, where the rioting white mob shot at Plaintiff's

16  family.  Plaintiff was unlawfully detained against her will in

17  the Fairground detention center.  As required by the Oklahoma

18  State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the

19  Executive Director of the Oklahoma Historical Society has

20  certified that Plaintiff is a Riot Survivor.

21      96.  Plaintiff EUNICE CLOMAN JACKSON is an individual

22  residing in the State of Oklahoma. Plaintiff was born on August

23  17, 1903.  At the time of the Riot, Plaintiff lived at 401 E.

24  Marshall Street in the Greenwood District of Tulsa.  Plaintiff

25  was unlawfully detained against her will in one of the detention

26

centers. During the Riot the Tulsa police captured Plaintiff and took her, along with her mother and brother, to the Convention Center detention center. Plaintiff's mother's white employer "claimed" the family from the Convention Center. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

97. Plaintiff GENEVIEVE ELIZABETH TILLMAN JACKSON is an individual residing in the State of Oklahoma. Plaintiff was born on June 29, 1915. At the time of the Riot, Plaintiff lived on Brickyard (now Frankfort) Hill in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. Plaintiff saw airplanes drop incendiary devices on Greenwood. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

98. Plaintiff WILLIE BELL WHITE JACKSON is an individual residing in the State of Ohio. Plaintiff was born on June 4, 1910. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

1          99. Plaintiff DR. HOBART JARRETT is an individual
2   residing in the State of New York. Plaintiff was born on June 4,
3   1910. At the time of the Riot, plaintiff lived at 1213 N.
4   Greenwood Street in the Greenwood District of Tulsa.
5   Plaintiff's parents owned a store on Easton Street, in
6   Greenwood. Plaintiff's family property was destroyed during the
7   Riot. During the Riot, the rioting white mob burned down the
8   store and looted, defecated, and urinated in their home.
9   Plaintiff was unlawfully detained against his will in one of the
10  detention centers. The National Guard took plaintiff and his
11  family into custody and transported them to the Fairground
12  detention center. As required by the Oklahoma State Legislature
13  (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director
14  of the Oklahoma Historical Society has certified that Plaintiff
15  is a Riot Survivor.

16        100. Plaintiff ARTIE LACY JOHNSON is an individual
17  residing in the State of Missouri. Plaintiff was born on July
18  29, 1915. At the time of the Riot, plaintiff lived on Bullette
19  Street in the Greenwood District of Tulsa. Plaintiff is the
20  sister of Plaintiff LULA BELLE LACY BULLOCK. Plaintiffs fled the
21  Rioting white mob. Plaintiffs' property was destroyed during
22  the Riot: their family store and home were burned down. As
23  required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
24  §8205 (West 2000)), the Executive Director of the Oklahoma

1  Historical Society has certified that Plaintiff is a Riot
2  Survivor.

3      101. Plaintiff WILMA MITCHELL JOHNSON is an individual
4  residing in the State of New Mexico. Plaintiff was born on August
5  14, 1919. At the time of the Riot, Plaintiff lived at 1421 N.
6  Kenosha Street in the Greenwood District of Tulsa. During the
7  Riot, the rioting white mob shot Plaintiff's father three times,
8  but Plaintiff's father survived. Plaintiff's family property was
9  destroyed during the Riot. The rioting white mob burned down
10 Plaintiff's parents' restaurant. As required by the Oklahoma
11 State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
12 Executive Director of the Oklahoma Historical Society has
13 certified that Plaintiff is a Riot Survivor.

14     102. Plaintiff EDWARD EARVEN JONES is an individual
15 residing in the State of Oklahoma. Plaintiff was born on March
16 24, 1920. At the time of the Riot, Plaintiff lived on East
17 Davenport Avenue in the Greenwood District of Tulsa. Plaintiff's
18 mother saw airplanes piloted by white rioters drop incendiary
19 devices during the Riot. Plaintiff escaped from the Riot with
20 his family to Catoosa, Oklahoma, and then to Red Bird, Oklahoma.
21 As required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
22 §8205 (West 2000)), the Executive Director of the Oklahoma
23 Historical Society has certified that Plaintiff is a Riot
24 Survivor.

25

26

Draft G

-54-

COMPLAINT

1     103. Plaintiff HAZEL DOLORES SMITH JONES is an
2  individual residing in Tulsa, Oklahoma. Plaintiff was born on
3  January 8, 1919. At the time of the Riot, Plaintiff lived with
4  her thirteen brothers and sisters at 1205 N. Madison Street in
5  the Greenwood District of Tulsa. Plaintiff's family property was
6  destroyed during the Riot. The rioting white mob burned
7  Plaintiff's family home to the ground. Plaintiff was unlawfully
8  detained against her will in one of the detention centers.
9  Plaintiff, along with her mother and her siblings, were taken to
10  the Fairground and were held for three or four days until
11  Plaintiff's father came for them.

12     104. Plaintiff THELMA THURMAN KNIGHT is an individual
13  residing in the State of Oklahoma. Plaintiff was born on May
14  30. 1915. At the time of the Riot, Plaintiff lived at 619 E.
15  Cameron Street in the Greenwood District of Tulsa. Plaintiff's
16  family property was destroyed during the Riot. As required by
17  the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
18  2000)), the Executive Director of the Oklahoma Historical
19  Society has certified that Plaintiff is a Riot Survivor.

20     105. Plaintiff LEANNA JOHNSON LEWIS is an individual
21  residing in the State of Oklahoma. Plaintiff was born on August
22  24, 1919. At the time of the Riot, Plaintiff lived in the
23  Greenwood District of Tulsa. As required by the Oklahoma State
24  Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
25  
26

1 Executive Director of the Oklahoma Historical Society has
2 certified that Plaintiff is a Riot Survivor.

3       106. Plaintiff KATIE MAE JOHNSON LIVINGSTON is an
4 individual residing in the State of Oklahoma. Plaintiff was born
5 on May 6, 1921. At the time of the Riot, Plaintiff lived in the
6 Greenwood District of Tulsa. Plaintiff's family property was
7 destroyed during the Riot: Plaintiff's house was burned down.
8 Plaintiff fled from the rioting white mob with her mother and
9 sister. They went to stay with relatives in Clarksville,
10 Oklahoma, and never returned to live in Tulsa. As required by
11 the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
12 2000)), the Executive Director of the Oklahoma Historical Society
13 has certified that Plaintiff is a Riot Survivor.

14       107. Plaintiff ALICE HIGGS LOLLIS is an individual
15 residing in the State of Oklahoma. Plaintiff was born on June
16 21, 1906. At the time of the Riot, Plaintiff lived on Pine
17 Place in the Greenwood District of Tulsa. Plaintiff was
18 unlawfully detained against her will in a segregated hospital
19 hastily created for African American Riot victims. Plaintiff,
20 who suffered from rheumatism, was forced to sleep on a mattress
21 on the ground in the hospital. As required by the Oklahoma
22 State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
23 Executive Director of the Oklahoma Historical Society has
24 certified that Plaintiff is a Riot Survivor.

25

26

108. Plaintiff ROANNA HENRY McCLURE is an individual residing in the State of Oklahoma. Plaintiff was born on February 21, 1914. At the time of the Riot, Plaintiff lived on Pine Place in the Greenwood District of Tulsa. The rioting white mob shot at Plaintiff and Plaintiff's grandmother from Resevoir Hill. Plaintiff was unlawfully detained against her will. After the Riot, Plaintiff was housed in a segregated makeshift hospital on 15th Street without sufficient beds, forcing her to lie on mattresses placed on the floor of the building. Plaintiff and Plaintiff's grandmother were later taken to the Fairgrounds where they slept on mattresses on the floor. Plaintiff's family property was destroyed: their house was set on fire and partially burned. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

109. Plaintiff ELDORIS MAE ECTOR McCONDICHIE is an individual residing in the State of Oklahoma. Plaintiff was born on September 8, 1911. At the time of the Riot, Plaintiff lived at 1341 N. Iroquois Street in the Greenwood District of Tulsa. During the Riot, Plaintiff witnessed whites piloting airplanes from which they shot at fleeing African American men, women, and children. Plaintiff fled with her family to Pawhuska, Oklahoma. Plaintiff still has nightmares about the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West

1   2000)), the Executive Director of the Oklahoma Historical Society

2   has certified that Plaintiff is a Riot Survivor.

3   110. Plaintiff CAROL SMITHERMAN MARTIN is an individual

4   residing in the State of North Carolina. Plaintiff was born on

5   December 22, 1912. At the time of the Riot, Plaintiff lived in

6   the Greenwood District of Tulsa. Plaintiff suffered property

7   damage during the Riot: her father, Andrew Jackson Smitherman,

8   owned a newspaper and his business and family home was burned to

9   the ground. Plaintiff was forced to flee Tulsa by the rioting

10  white mob. One year after the Riot, Klansmen cut off Plaintiff's

11  uncle's ear in an act of racial intimidation and violence. As

12  required by the Oklahoma State Legislature (74 Okl. Stat. Ann.

13  §8205 (West 2000)), the Executive Director of the Oklahoma

14  Historical Society has certified that Plaintiff is a Riot

15  Survivor.

16  111. Plaintiff MARY TACOMA MAUPIN is an individual

17  residing in the State of Kentucky. Plaintiff was born on

18  November 9, 1905. At the time of the Riot, Plaintiff lived at

19  507 N. Detroit Avenue in the Greenwood District of Tulsa.

20  Plaintiff resided with her uncle. Plaintiff's family property

21  was destroyed during the Riot. The rioting white mob burned and

22  looted the family home. Plaintiff heard the rioting whites

23  exclaim: "These niggers have better things than we do!" What

24  the rioting white mob could not take it destroyed. Plaintiff

25  was unlawfully detained against her will in one of the detention

26

centers. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

112. Plaintiff WILLIE MUSGROVE MEANS is an individual residing in the State of California. Plaintiff was born on August 24, 1916. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

113. Plaintiff ISHMAEL S. MORAN is an individual residing in the State of California. Plaintiff was born on January 1, 1920. At the time of the Riot, Plaintiff lived at 313 N. Elgin in the Greenwood District of Tulsa. Plaintiff's father worked at the National Bank of Tulsa on Boston Street. Plaintiff was forced to flee his house and hide from the rioting white mob. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

114. Plaintiff RUTH DEAN NASH is an individual residing in the State of Oklahoma. Plaintiff was born on September 9, 1915. At the time of the Riot, Plaintiff lived on Latimer Street in the Greenwood District of Tulsa. Plaintiff's property

was destroyed during the Riot. The rioting white mob burned
Plaintiff's home to the ground. To escape the Riot, Plaintiff
and her mother fled in a car for Muskogee, Oklahoma. Plaintiff
and her mother were taken to the Dunbar School and later joined
by her father. As required by the Oklahoma State Legislature
(74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director
of the Oklahoma Historical Society has certified that Plaintiff
is a Riot Survivor.

115. Plaintiff SIMEON L. NEAL is an individual residing
in the State of Illinois. Plaintiff was born on August 31, 1920.
At the time of the Riot, Plaintiff lived in the Greenwood
District of Tulsa. Plaintiff's family property was destroyed
during the Riot: his father's tailor shop and three rented homes
were burned. Plaintiff was forced to flee from the rioting white
mob. As required by the Oklahoma State Legislature (74 Okl.
Stat. Ann. §8205 (West 2000)), the Executive Director of the
Oklahoma Historical Society has certified that Plaintiff is a
Riot Survivor.

116. Plaintiff ALMADGE J. NEWKIRK is an individual
residing in the State of California. Plaintiff was born on
October 13, 1913. At the time of the Riot, Plaintiff lived at
119 N. Greenwood Avenue in the Greenwood District of Tulsa.
Plaintiff's parents ran a business consisting of a bakery and a
confectionary shop, and a photography studio. Plaintiff's family
property was destroyed during the Riot. The rioting white mob

destroyed the buildings and the business in the course of the
Riot. As required by the Oklahoma State Legislature (74 Okl.
Stat. Ann. §8205 (West 2000)), the Executive Director of the
Oklahoma Historical Society has certified that Plaintiff is a
Riot Survivor.

117. Plaintiff MYRTLE NAPIER OLIVER is an individual
residing in the State of Georgia. Plaintiff was born in 1911.
At the time of the Riot, Plaintiff lived at 526 N. Elgin Street
in the Greenwood District of Tulsa with her family. As required
by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205
(West 2000)), the Executive Director of the Oklahoma Historical
Society has certified that Plaintiff is a Riot Survivor.

118. Plaintiff JUANITA MAXINE SCOTT PARRY is an
individual residing in the State of Oklahoma. Plaintiff was born
on June 21, 1919. At the time of the Riot, Plaintiff lived at
341 or 404 N. Elgin Street in the Greenwood District of Tulsa.
Plaintiff is the sister of Plaintiff JULIUS WARREN SCOTT.
Plaintiff's family home was destroyed during the Riot.
Plaintiff fled with her family to the home of an attorney named
I.H. Spears and saw people burning houses at Hartford near
Archer. As required by the Oklahoma State Legislature (74 Okl.
Stat. Ann. §8205 (West 2000)), the Executive Director of the
Oklahoma Historical Society has certified that Plaintiff is a
Riot Survivor.

119. Plaintiff IDA BURNS PATTERSON is an individual residing in the State of Florida. Plaintiff was born on January 25, 1919. Plaintiff is the sister of Plaintiff JOE R. BURNS. At the time of the Riot, Plaintiff lived at 517 Latimer Court in the Greenwood District of Tulsa. During the Riot Plaintiff fled with her family from the rioting white mob and hid in a ravine on Apache Street. Plaintiff suffered property damage during the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

120. Plaintiff FREDDIE SCOTT PAYNE is an individual residing in the State of California. Plaintiff was born on November 8, 1914. Plaintiff resided in Greenwood, across from Booker T. Washington High School on a steep hill behind the school at the time of the riot. Plaintiff's grandfather and uncle were killed during the riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

121. Plaintiff JOAN ALEXANDER POWDRILL is an individual residing in the State of California. Plaintiff was born on March 27, 1917. Plaintiff lived at 1621 North Norfolk Street in the Greenwood District of Tulsa. Plaintiff is the sister of Plaintiff JOHN MELVIN ALEXANDER. As required by the

Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

122. Plaintiff ALICE PRESLEY is an individual residing in the State of California. Plaintiff was born on March 8, 1921. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. The Riot so traumatized Plaintiff's parents that they left Tulsa for good after the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

123. Plaintiff DeLOIS VADEN RAMSEY is an individual residing in the State of Oklahoma. Plaintiff was born on March 5, 1919. At the time of the Riot, Plaintiff lived on Elgin Street in the Greenwood District of Tulsa. Plaintiff's father owned a Vaden's Pool Hall, a popular recreation spot frequented by many notable African Americans. Plaintiff's family property was destroyed during the Riot by the rioting white mob: they even shot her dog. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

124. Plaintiff CORA HAWKINS RENFRO is an individual residing in the State of Illinois. Plaintiff was born on April 28, 1920. At the time of the Riot, Plaintiff lived in the

Greenwood District of Tulsa. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

125. Plaintiff SIMON R. RICHARDSON is an individual residing in the State of Oklahoma. Plaintiff was born on February 12, 1914. At the time of the Riot, Plaintiff lived on Greenwood Avenue in the Greenwood District of Tulsa. Plaintiff was unlawfully detained against his will in the Convention Center detention center. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

126. Plaintiff JEWEL SMITHERMAN ROGERS is an individual residing in the State of California. Plaintiff was born on June 12, 1917. At the time of the Riot, Plaintiff lived on Elgin Street in the Greenwood District of Tulsa. Plaintiff suffered property damage during the Riot: her family home was burned to the ground. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

127. Plaintiff JULIUS WARREN SCOTT is an individual residing in the State of Oklahoma. Plaintiff was born on September 23, 1921. Plaintiff was born in a tent in the Greenwood

1 District of Tulsa in the immediate aftermath of the Riot.

2 Plaintiff is the brother of Plaintiff JUANITA MAXINE SCOTT PERRY.

3 Plaintiff's family home was destroyed during the Riot. As

4 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.

5 §8205 (West 2000)), the Executive Director of the Oklahoma

6 Historical Society has certified that Plaintiff is a Riot

7 Survivor.

8 128. Plaintiff ORA LEE SCOTT is an individual residing

9 in the State of California. Plaintiff was born on August 4,

10 1912. At the time of the Riot, Plaintiff lived in the Greenwood

11 District of Tulsa. Plaintiff and her family fled the rioting

12 white mob. The Riot caused Plaintiff's family to leave Tulsa

13 and move to California. As required by the Oklahoma State

14 Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the

15 Executive Director of the Oklahoma Historical Society has

16 certified that Plaintiff is a Riot Survivor.

17 129. Plaintiff TULETA S. DUNCAN SHAWNEE is an

18 individual residing in the State of California. Plaintiff was

19 born on September 7, 1903. At the time of the Riot, Plaintiff

20 lived at 1062 N. Lansing Street in the Greenwood District of

21 Tulsa. Plaintiff fled from the rioting white mob. Plaintiff

22 left Tulsa after the Riot, never to return. As required by the

23 Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West

24 2000)), the Executive Director of the Oklahoma Historical

25 Society has certified that Plaintiff is a Riot Survivor.

26

130. Plaintiff VENEICE DUNN SIMMS is an individual residing in the State of Oklahoma. Plaintiff was born on January 21, 1905. At the time of the Riot, Plaintiff lived at 1027 N. Kenosha Street in the Greenwood District of Tulsa. Plaintiff's family home was destroyed during the Riot. Plaintiff's family fled from Tulsa, never to return. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

131. Plaintiff HAL "CORNBREAD" SINGER is an individual residing in Nanterre, France. Plaintiff was born on October 8, 1919. At the time of the Riot, Plaintiff lived on Frankfort Avenue in the Greenwood District of Tulsa. Plaintiff suffered property damage during the Riot. The rioting white mob destroyed Plaintiff's family's home and property. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

132. Plaintiff BEULAH LOREE KEENAN SMITH is an individual residing in the State of Oklahoma. Plaintiff was born on May 20, 1908. At the time of the Riot, Plaintiff lived at 1411 N. Lansing Street in the Greenwood District of Tulsa. Plaintiff's property was destroyed during the Riot. Plaintiff suffered physical injury during the Riot, as her back was

injured fleeing from the mob.  Her family attempted to evade
capture by hiding in a hog pen, but her father was captured and
placed in a detention center.  As required by the Oklahoma State
Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the
Executive Director of the Oklahoma Historical Society has
certified that Plaintiff is a Riot Survivor.

133. Plaintiff GOLDEN WILLIAMS SMITH is an individual
residing in the State of Oklahoma. Plaintiff was born on May 20,
1916.  At the time of the Riot, Plaintiff lived on Greenwood
Avenue in the Greenwood District of Tulsa. Plaintiff's family
property was destroyed during the Riot.  The rioting white mob
burned down Plaintiff's parents' home and the state or municipal
authorities removed Plaintiff's family to the Fairground
detention center.  As required by the Oklahoma State Legislature
(74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director
of the Oklahoma Historical Society has certified that Plaintiff
is a Riot Survivor.

134. Plaintiff LOLA SNEED SNOWDEN is an individual
residing in the State of Indiana.  Plaintiff was born on January
21, 1915.  At the time of the Riot, Plaintiff resided on Cruse
Street in the Greenwood District of Tulsa.  Plaintiff's property
was destroyed in the riot, including her family home.  Plaintiff
and her family fled to the woods and stayed with several Native
American families before returning to Tulsa.  Plaintiff still
suffers from phobias and nightmares.  As required by the

Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

135. Plaintiff JAMES L. STEWARD is an individual residing in the State of Oklahoma. Plaintiff was born on July 12, 1917. At the time of the Riot, Plaintiff lived at 444 E. Marshall Place in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. The rioting white mob set fire to his home while Plaintiff and his family were still inside. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

136. Plaintiff DOROTHY WILSON STRICKLAND is an individual residing in the State of Illinois. Plaintiff was born on November 6, 1912. At the time of the Riot, Plaintiff lived at 419 E. Latimer Court in the Greenwood District of Tulsa. Plaintiff's family suffered property damage during the Riot: her father's store was one of the first buildings burned by the rioting white mob. Plaintiffs were forced to flee from the rioting white mob. Plaintiff was unlawfully detained against his will in one of the detention centers. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

1    137. Plaintiff SARAH TATUM is an individual residing

2 in the State of Connecticut. Plaintiff was born on April 20,

3 1912. At the time of the Riot, Plaintiff lived in the Greenwood

4 District of Tulsa. As required by the Oklahoma State

5 Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the

6 Executive Director of the Oklahoma Historical Society has

7 certified that Plaintiff is a Riot Survivor.

8    138. Plaintiff LOIS WHITE TAYLOR is an individual

9 residing in the State of California. Plaintiff was born on

10 September 27, 1919. At the time of the Riot, Plaintiff resided

11 at 1273 N. Lansing Street in the Greenwood District of Tulsa.

12 Plaintiff fled from the rioting white mob with her brother and

13 mother to Turley, Oklahoma, a town north of Tulsa. Plaintiff's

14 family property was destroyed during the Riot: all their

15 personnel possessions were destroyed or looted, and the family

16 home was damaged in the fire.

17    139. Plaintiff WILLIE MAE SHELBURN THOMPSON is an

18 individual residing in the State of Oklahoma. Plaintiff was born

19 on December 4, 1912. At the time of the Riot, Plaintiff lived at

20 on Lansing Avenue in the Greenwood District of Tulsa.

21 Plaintiff's family property was destroyed during the Riot.

22 After the Riot, Plaintiff's family was so concerned for her

23 safety that they sent her to live with her father in Austin,

24 Texas. As required by the Oklahoma State Legislature (74 Okl.

25 Stat. Ann. §8205 (West 2000)), the Executive Director of the

26

1  Oklahoma Historical Society has certified that Plaintiff is a
2  Riot Survivor.

3      140. Plaintiff EFFIE LEE SPEARS TODD is an individual
4  residing in the State of Oklahoma. Plaintiff was born on
5  November 5, 1908. At the time of the Riot, Plaintiff lived in
6  the Greenwood District of Tulsa. Plaintiff fled from the rioting
7  white mob. Plaintiff's property was destroyed during the Riot.
8  As required by the Oklahoma State Legislature (74 Okl. Stat.
9  Ann. §8205 (West 2000)), the Executive Director of the Oklahoma
10 Historical Society has certified that Plaintiff is a Riot
11 Survivor.

12     141. Plaintiff MELVIN C. TODD is an individual
13 residing in the State of Oklahoma. Plaintiff was born on April
14 12, 1910. At the time of the Riot, Plaintiff lived on Elgin
15 Street in the Greenwood District of Tulsa. Plaintiff suffered
16 property damage during the Riot: his house was burned down. As
17 required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
18 §8205 (West 2000)), the Executive Director of the Oklahoma
19 Historical Society has certified that Plaintiff is a Riot
20 Survivor.

21     142. Plaintiff KATHRYN MAE TAYLOR TOLIN is an
22 individual residing in the State of California. Plaintiff was
23 born on August 27, 1910. At the time of the Riot, Plaintiff
24 lived in the Greenwood District of Tulsa. As required by the
25 Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West

26

1  2000)), the Executive Director of the Oklahoma Historical

2  Society has certified that Plaintiff is a Riot Survivor.

3  143. Plaintiff BESSIE MAE AUSTIN VESTER is an

4  individual residing in the State of Oklahoma. Plaintiff was

5  born on September 28, 1919. At the time of the Riot, Plaintiff

6  lived in the Greenwood District of Tulsa. Plaintiff's sister

7  was badly burned during the Riot. As required by the Oklahoma

8  State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the

9  Executive Director of the Oklahoma Historical Society has

10  certified that Plaintiff is a Riot Survivor.

11  144. Plaintiff QUEEN ESTHER LOVE WALKER is an

12  individual residing in the State of Oklahoma. Plaintiff was

13  born on May 4, 1921. At the time of the Riot, Plaintiff lived

14  in the Greenwood District of Tulsa. Plaintiff's family property

15  was destroyed during the Riot, including a house on Greenwood

16  Avenue and a prosperous restaurant. The rioting white mob shot

17  at Plaintiff and her family while they attempted to flee. As

18  required by the Oklahoma State Legislature (74 Okl. Stat. Ann.

19  §8205 (West 2000)), the Executive Director of the Oklahoma

20  Historical Society has certified that Plaintiff is a Riot

21  Survivor.

22  145. Plaintiff SAMUEL WALKER is an individual residing

23  in the State of Missouri. Plaintiff was born on September 28,

24  1921. At the time of the Riot, Plaintiff's mother, who lived on

25  Frankfort Avenue in the Greenwood District of Tulsa, was

26

pregnant with Plaintiff.  Plaintiff was born prematurely in a
Red Cross tent put up for the Riot survivors.  Plaintiff is the
brother of Plaintiffs TROY SIDNEY WALKER and JOYCE WALKER HILL.
Plaintiff's family property was destroyed during the Riot.  As
required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
§8205 (West 2000)), the Executive Director of the Oklahoma
Historical Society has certified that Plaintiff is a Riot
Survivor.

146. Plaintiff TROY SIDNEY WALKER is an individual
residing in the State of Washington. Plaintiff was born on
August 16, 1918.  At the time of the Riot, Plaintiff lived on
Frankfort Avenue in the Greenwood District of Tulsa.  Plaintiff
is brother of JOYCE WALKER HILL and SAMUEL WALKER. Plaintiff's
family property was destroyed during the Riot.  As required by
the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
2000)), the Executive Director of the Oklahoma Historical
Society has certified that Plaintiff is a Riot Survivor.

147. Plaintiff OSCAR DOUGLAS WASHINGTON is an
individual residing in the State of Missouri.  Plaintiff was
born on February 18, 1912.  At the time of the Riot, Plaintiff
lived on the 900 Block of Queen Street in the Greenwood District
of Tulsa.  Plaintiff saw airplanes flying low over Greenwood.
Plaintiff fled with his family from the rioting white mob.  As
required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
§8205 (West 2000)), the Executive Director of the Oklahoma

Historical Society has certified that Plaintiff is a Riot

Survivor.

148. Plaintiff MARY LEON BROWN WATSON is an individual residing in the State of Oklahoma. Plaintiff was born on October 9, 1909. At the time of the Riot, Plaintiff lived in the Webb Hotel on the corner of Greenwood Avenue and Archer Street in the Greenwood District of Tulsa. Plaintiff's family property was destroyed during the Riot. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

149. Plaintiff ALLEN MATTHEW WHITE is an individual residing in the State of Ohio. Plaintiff was born on February 4, 1917. At the time of the Riot, Plaintiff lived at 1431 N. Lansing Street in the Greenwood District of Tulsa with his family. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

150. Plaintiff CECIL WHITE is an individual residing in the State of California. Plaintiff was born on April 15, 1919. At the time of the Riot, Plaintiff lived at 427 E. Latimer Street in the Greenwood District of Tulsa. During the Riot, the rioting white mob shot and killed Plaintiff's uncle. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West

2000)), the Executive Director of the Oklahoma Historical
Society has certified that Plaintiff is a Riot Survivor.

151. Plaintiff MARIE WHITEHORN is an individual
residing in the State of California. Plaintiff was born on
April 24, 1910. At the time of the Riot, Plaintiff lived on
Greenwood Avenue in the Greenwood District of Tulsa. Plaintiff
fled from the rioting white mob during the course of the Riot.
Plaintiff suffered emotional trauma as a result of the Riot. As
required by the Oklahoma State Legislature (74 Okl. Stat. Ann.
§8205 (West 2000)), the Executive Director of the Oklahoma
Historical Society has certified that Plaintiff is a Riot
Survivor.

152. Plaintiff MILDRED EVITT WILBURN is an individual
residing in the State of Oklahoma. Plaintiff was born on January
17, 1921. At the time of the Riot, Plaintiff lived in the
Greenwood District of Tulsa with her family. As required by the
Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West
2000)), the Executive Director of the Oklahoma Historical Society
has certified that Plaintiff is a Riot Survivor.

153. Plaintiff BERTRAM C. WILLIAMS is an individual
residing in the State of Washington. Plaintiff was born on
September 22, 1920. At the time of the Riot, Plaintiff lived at
543 E. Latimer Court in the Greenwood District of Tulsa.
Plaintiff was unlawfully detained against his will in one of the
detention centers. During the Riot, Plaintiff fled from the

rioting white mob with his family to Mowhawk Park, where the National Guard captured him and took him to a detention center. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

154. Plaintiff LOUIE BARTON WILLIAMS is an individual residing in the State of Illinois. Plaintiff was born on September 21, 1912. At the time of the Riot, Plaintiff lived in the Greenwood District of Tulsa. Plaintiff was order from her house by the rioting white mob, and fled until she was caught. Plaintiff was unlawfully detained against her will in one of the detention centers. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma Historical Society has certified that Plaintiff is a Riot Survivor.

155. Plaintiff WESS YOUNG is an individual residing in the State of Oklahoma. Plaintiff was born on February 20, 1917. At the time of the Riot, Plaintiff lived on the 300 block of N. Hartford Avenue in the Greenwood District of Tulsa. Plaintiff was captured by the National Guard and unlawfully detained against his will at the Booker T. Washington High School. As required by the Oklahoma State Legislature (74 Okl. Stat. Ann. §8205 (West 2000)), the Executive Director of the Oklahoma

Historical Society has certified that Plaintiff is a Riot
Survivor.

156. Each of the Plaintiffs described above suffered
and was directly injured in some way by the unlawful conduct of
the Defendants.

## ii   Descendants

157. The following Plaintiffs are descendants of Riot
victims who were killed during the Riot:

158. Plaintiffs ARTHUR JEFRERSON and JESSIE THOMAS are
the grandchildren of Johnny Adams, children of Eliza Adams and
nephew and niece of "Saucer" Grayson.  At the time of the Riot,
Plaintiffs and Plaintiffs mother lived on Jasper Street.
Plaintiff's family also owned six or seven rent houses on Jasper
Street just off Greenwood Avenue.  Everything they owned was
burned down by the white mob.  The family hid in an old shed
behind their homes near an alley and watched through cracks as
the white mob set fire to their property.  The white mob was
heavily armed, shooting everywhere and their uncle, "Saucer"
Grayson was shot and killed.

159. Plaintiff MARY A. WILSON is an individual
residing at Englewood, Colorado.  Plaintiff is a descendant of
Dan Wilson, Violet Dixon Wilson, and Richard E. Wilson.  At the
time of the Riot, Dan Wilson, Violet Dixon Wilson, and Richard
E. Wilson lived in the Greenwood District of Tulsa.  Dan Wilson,

who came to Tulsa from Kingfisher, Oklahoma, was captured during the Riot and disappeared.

160. Plaintiff DOROTHY WILLIAMS BRANLETT is an individual residing in Tulsa, Oklahoma. Plaintiff GRANT WILLIAMS is an individual residing in University City, Missouri. Plaintiffs are grandchildren of Fisher James Williams and Dinah Freeman Williams. At the time of the Riot, Fisher James Williams lived in the Greenwood District of Tulsa, and was injured during the Riot. Plaintiff's father died as a result of his injuries at St. John's Hospital on June 21, 1921.

161. Plaintiff GERALDINE PERRYMAN-TEASE is an individual residing in Tulsa, Oklahoma. The plaintiff is the daughter of Addie Perryman-Tease and the niece of Bob Perryman. At the time of the Riot, Addie Perryman-Tease and Bob Perryman lived in the Greenwood District of Tulsa. Bob Perryman was killed during the Riot.

162. Plaintiff MILDRED MARIAN HAMEL MILLER is an individual residing in Austin, Texas. Plaintiff LADAWNA MILLER is an individual residing in Austin, Texas. Plaintiffs are the descendants of Tom Swift Hamel and Luvenia Williams. At the time of the Riot, Tom Swift Hamel and Luvenia Williams lived in the Greenwood District of Tulsa.

163. Plaintiff PATSY ROBINSON is the granddaughter of Pearl Oliver, the daughter of Montana Wright and the niece of Paris Oliver. At the time of the Riot, Pearl Oliver and Paris

Oliver lived in the Greenwood District of Tulsa. Plaintiff and her family lived on Greenwood at the time of the Riot. Plaintiff's grandmother suffered an emotional and mental breakdown as a result of the Riot and was never the same. Plaintiff's uncle was harmed in the Riot. Plaintiff's family home was destroyed in the Riot.

164. Plaintiff MARGARET THARPE is the daughter of Geraldine Smith Marks, the granddaughter of Omega Smith and the great-granddaughter of Abigail Goodson. At the time of the Riot, Geraldine Smith Marks, Omega Smith and Abigail Goodson lived in the Greenwood District of Tulsa. Plaintiff's uncle disappeared during the Riot and was never heard from again.

165. Plaintiff MAXINE JACKSON LACY is the daughter of Ed and Cory Jackson and the granddaughter of Ella Johnson. At the time of the Riot, Ed Jackson, Cory Jackson, and Ella Johnson owned two homes, one on N. Owasso and the other on Easton near Mt. Zion Baptist Church. The house on Easton was completely destroyed in the Riot. Plaintiff's father attempted to escape with his family. Plaintiff's pregnant mother fell down during her escape. Plaintiff's family fled to Claremore, Oklahoma, where they were rescued by their employer, Miller Hamett. Plaintiff's grandmother, Ella Johnson disappeared and was never heard from again.

The following plaintiffs are descendants of Riot Survivors whose property was unlawfully taken by Defendants or who were

unlawfully detained against their will; or who were forced to
flee from their homes by the rioting white mob; or who suffered
physical or emotional injury during the Riot at the hands of the
rioting white mob:

166. Plaintiff JOHN HOPE FRANKLIN; Plaintiff RAYMOND
PRESLEY; Plaintiff CAESAR LATIMER; Plaintiffs WILLIAM
SHAKESPEARE LATIMER; JAYPHEE CLINTON; MAJOR SYLVESTER LATIMER;
ELIHU LATIMER; FRED LATIMER, SR.; PATELLA LATIMER PEGUES; THELLA
LATIMER; ELLA LATIMER BRADFORD; MAGGIE LATIMER and ALICE
LATIMER; Plaintiff CHRISTOPHER ANITA WILLIAMS; Plaintiff JUANITA
ALEXANDER HOPKINS; Plaintiff JOHNETTA ADAMS; Plaintiff RHONDA
ANDERSON; Plaintiff ROBERT EARL ANDERSON; Plaintiff DIANE
ANDERSON STEELE; Plaintiff MARIETTA ANDERSON WAITERS; Plaintiffs
RUTH ELLA AUTRY, JAMES AUTRY, OTIS and ELMER AUTRY; Plaintiffs
AILEEN JOANNE AUSTIN COBURN and LEONA AUSTIN McCAIN: Plaintiff
RAMONA DINKINS WIMBERLY; Plaintiffs ERLINE CROSSLIN, BILLIE
WAYNE RUCKER, J. C. RUCKER, ROBERT C. RUCKER and ROSELLA TURNER;
Plaintiff JOHN BAILEY; Plaintiff ROY DAVIS; Plaintiffs A. BANKS,
BERNICE BANKS DAVIS and AUDREY BANKS PARSON; Plaintiffs MARY
BELL ARRINGTON, R.G. BELL and CATHRYN Bell SNODDY; Plaintiffs
LISA PRESLEY and JILL ELIZABETH PRESLEY; Plaintiff JEAN WILLIAMS
MCGILL; Plaintiff MATTIE DAVIS OLIVER; Plaintiffs ALLENE
KNIGHTEN RAYFORD and JAMES BERNARD KNIGHTEN; Plaintiffs BERNICE
LAWLER and LORRAINE MCFARLAND; Plaintiffs THELMA KINLAW GERMANY;
Plaintiffs DOROTHY JONES, NANCY MARTIN, CATHERINE MARTIN, JAMES

```
 1  PRESTON MARTIN, FELTON MARTIN, LESLIE BEARD; Plaintiffs MARY

 2  PRISCILLA PARKER HARRISON and GENIEIVE JACKSON; Plaintiffs DIANA

 3  LYNN SHELTON and SHIRLEY SHELTON; Plaintiffs OSCAR BOYD and

 4  ALICE BOYD VAUGHN; Plaintiff HELEN SIPUELHUGGINS; Plaintiff

 5  LAVADA LOUISE PARKER OSBOURNE; Plaintiffs HOWARD LEROYD DENNIE,

 6  LAWRENCE HERMAN DENNIE, ALFREDA O. DENNIE FRANKLIN, NORMAN JEAN

 7  DENNIE LESHIE, FRANK EUGENE RODGERS, IDA LOUISE DENNIE WILLIS

 8  and EDNA EARLY WORKS; Plaintiff LEONA JERRYE BRUNER ANTHONY;

 9  Plaintiff NAOMI LAWSON BROWN; Plaintiff EDWARD LAWSON; Plaintiff

10  WILBUR FOSTER; Plaintiff RONALD EARL MOORE; Plaintiff BERNARD

11  CARTER; Plaintiff EDDIE HUE CARTER; Plaintiff ROBERT CARTER,

12  JR.; Plaintiff SAMUEL LEE CARTER; Plaintiff BOBBIE JEAN CARTER

13  TENNYSON; Plaintiff JOHNYE CANNON LAWSON; Plaintiff NATHANIEL

14  CANNON; Plaintiff HENRY CANNON;  Plaintiff MILDRED CANNON

15  WALLACE; Plaintiff SARAH CURVAY MAYSHAW; Plaintiff LINDA

16  EDMONDSON GRAVES; Plaintiff NAOMI NASH WILLIAMS WIMBERLY;

17  Plaintiff PATRICIA WILLIAMS; Plaintiff PEGGY ANN MCRUFFIN

18  MITCHELL; AUDELE BEEKS MCLEOD; Plaintiff FELICIA MCLEOD JOHNSON;

19  Plaintiff WALLACE MCLEOD, JR;  Plaintiff DELLA SHELTON JACKSON ;

20  Plaintiff JOHNNY SHELTON; Plaintiff FAYE MAY; Plaintiff BETTY

21  ANDERSON; Plaintiff MAIME SHELTON; Plaintiff BILLY SHELTON;

22  Plaintiff MARGARET LEE; Plaintiff EUNA VANN SMITH; Plaintiffs

23  MARIETTA ANDERSON WAITERS; Plaintiff DIANNE ANDERSON STEELE;

24  Plaintiff ROBERT EARL ANDERSON; Plaintiff RHONDA ANDERSON;

25  Plaintiff IRMA THOMAS ANTHONY; Plaintiff LEONTYNE THOMAS

26
```

HARRELL; Plaintiff JERRY FIELDS THOMAS; Plaintiffs OVEID LACY

III and ROBERT LACY; Plaintiff NICKOLAS A. BANKS ; Plaintiff

BERNICE E. DAVIS ; Plaintiff AUDREY PARSONS; Plaintiff LEROY

KIRK, JR.; Plaintiff MAE ETTA REYNOLDS; Plaintiff JOHN W.

PATTON; Plaintiff JO ANN EWING; Plaintiff WANDA EWING POPE;

Plaintiff ROBERT EWING; Plaintiff BILL EWING; Plaintiff BOBBYE

LOUISE GILBERT; Plaintiff FANNIE WILLIAMS; Plaintiff SIMON BERRY

JR.; Plaintiff MARGUERITE BAGBY; Plaintiff Maxine JESSIE VADEN;

Plaintiff JOYCE RAMSEY; Plaintiff RAYMOND BEARD,SR. ; Plaintiff

FLOYD PRICE is an individual residing in Tulsa, Oklahoma.

Plaintiff CAROLYN PRICE JOHNSON; Plaintiff MILDRED LOUISE DAVIS

SCOTT; Plaintiff THERESA DAVIS SCOTT; Plaintiff  FRED DAVIS ;

Plaintiff SANDRA JEAN DAVIS LANDRUM; Plaintiff ROSIE LEE

JACKSON; Plaintiff FRED SMITH; Plaintiff FANIIE SMITH VERNER;

Plaintiff ERMA SMITH THOMPSON; Plaintiff DELORES HARRINGTON;

Plaintiff SHIRLEY RIDLEY; Plaintiff PAT MOORE; Plaintiff SHIRLEY

TYUS; Plaintiff SELMA LOCKARD; Plaintiff FRANK LOCKARD;

Plaintiff JESSIE MAE LOCKARD; Plaintiff EDWARD LOCKWARD;

Plaintiff ERNEST LOCKARD; Plaintiff OSCAR LOCKARD; Plaintiff

CORTEZ LOCKARD; Plaintiff EMMA LOCKARD HORN; Plaintiff PATRICIA

WILLIAMS; Plaintiff LORENZO CARLOS VANN; Plaintiff CARRIE M.

MCDONALD STROTHER; Plaintiff JIMMIE WICKAM; Plaintiffs FRANK

WALKER, SR,; Plaintiff RILEY WALKER, JR; Plaintiff DANIEL WALKER

BITSON, JR., Plaintiff KEITH HAMILTON; Plaintiffs EDWINA WALKER

CARR; Plaintiff MARCIA WALKER POCKETT; Plaintiff WILLIAM D.

WALKER; Plaintiff OLENE WALKER WASHINGTON; Plaintiff JEANETTE
HAWKINS; Plaintiff OLANDER HAWKINS; Plaintiff STARLA HAWKINS;
Plaintiff CHARLOTTE WILLIAMS; Plaintiff NAOMI LAWSON BROWN ;
Plaintiff EDWARD LAWSON; Plaintiff MARCUS LAWSON; Plaintiff
MARGARET ANN LAWSON; PALMER LAWSON, JR; Plaintiff WILBUR FOSTER
and Plaintiff RONALD MOORE; Plaintiff BERNARD CARTER; Plaintiff
EDDIE CARTER; ROBERT CARTER, JR,; SAMUEL LEE CARTER; BOBBIE
JEAN CARTER TENNYSON; Plaintiff TERRY NASH; AUDREY TAYLOR and
BYRON TAYLOR; Plaintiff MILDRED MARIAN HAMEL MILLER; Plaintiff
LADAWNA MILLER; Plaintiff PATSY ROBINSON; Plaintiff MARGARET
THARP; Plaintiff MAXINE JACKSON LACY; Plaintiff RAYMOND PRESLEY.

### B.   Defendants

167. Defendant THE GOVERNOR OF THE STATE OF OKLAHOMA
is an individual living in the State of Oklahoma, and is sued in
his official capacity.

168. Defendant THE CITY OF TULSA is a municipality
located in the State of Oklahoma.

169. Defendant THE CHIEF OF POLICE OF THE CITY OF
TULSA is an individual living in the State of Oklahoma, and is
sued in his official capacity.

170. Defendant THE CITY OF TULSA POLICE DEPARTMENT is
an entity located in the State of Oklahoma.

171. Plaintiffs are unaware of the true names and
capacities of Defendants DOES 1 through 100, inclusive, and

accordingly sue said Defendants by such fictitious names. As
soon as Plaintiffs learn the true names and capacities of
Defendants DOES 1 through 100, inclusive, it will amend this
Complaint accordingly. Plaintiffs are informed and believe and
therefore allege that Defendants DOES 1 through 100, inclusive,
are in some way responsible for the acts and obligations sued
upon herein. "THE GOVERNOR OF THE STATE OF OKLAHOMA," "THE CITY
OF TULSA," "THE CHIEF OF POLICE," "THE CITY OF TULSA POLICE
DEPARTMENT," and DOES 1 through 100, inclusive, shall be
referred to collectively herein as "Defendants."

## FACTUAL BACKGROUND[36]

### A. Greenwood, 1921

172. Plaintiffs incorporate by reference paragraphs 1-91.

173. The widespread atmosphere of racial hostility in
Oklahoma in the years preceding the riots was exacerbated by
Tulsa whites' anger at the prosperity of the Greenwood
District.[37]

---

36. The factual references in the factual background are taken
from the Commission Report and the documents published along
with it; Scott Ellsworth, Death in a Promised Land: The Tulsa
Race Riot of 1921 (1982); Alfred Brophy, Reconstructing the
Dreamland (2002); and the recollection of various Survivors of
the Riot.
37. See Scott Ellsworth, Death in a Promised Land: The Tulsa

174. In the spring of 1921, Greenwood, the African American section of Tulsa, was one of the most vibrant African American communities in America. About 8,000 people lived in the largely self-sufficient community.[38]

175. Greenwood's professional class had become so prosperous by 1921, that the streets on which it conducted its business were collectively known nationally as the "Negro Wall Street."[39]

176. Running north out of the downtown commercial district—and shaped, more or less, like an elongated jigsaw puzzle piece—Greenwood was bordered by the Frisco railroad yards to the south, by Lansing Street and the Midland Valley tracks to the east, and by Stand Pipe and Sunset Hills to the west.[40]

177. The southern end of Greenwood Avenue, including the adjacent side streets, was the home of the African American commercial district. This several block stretch of handsome one, two, and three-story red brick buildings housed dozens of African American-owned and -operated businesses, including grocery stores and meat markets, clothing and dry good stores, billiard halls, beauty parlors and barber shops, as well as a

Race Riot of 1921 (1982).
38. Alfred Brophy, Reconstructing the Dreamland : The Tulsa Riot of 1921 (2002).
39. Scott Ellsworth, Death in a Promised Land: The Tulsa Race Riot of 1921 22 (1982).
40. Dr. Scott Ellsworth, The Tulsa Race Riot, published with the

drug store, a jewelry store, an upholstery shop, and a
photography studio.

178. Greenwood's economy was diverse, consisting of
business persons and professionals as well as skilled and semi-
skilled workers. Because of racial segregation, these businesses
served primarily African Americans.  It is estimated that
Greenwood had 33 professionals, including 2 dentists, 4
druggists, 1 jeweler, 3 lawyers, 2 photographers, 10 physicians,
and 6 real estate/insurance agents.  It is estimated that by
1921 Greenwood boasted 108 business establishments, which
included 9 billiard halls, 2 retail stores, 4 confectioneries, 1
feed and grain store, 11 boarding houses, 2 garages, 41
groceries, 5 hotels, 30 restaurants, 2 movie theaters, and 1
undertaker's parlor. Greenwood's economy also consisted of an
estimated 24 skilled crafts persons, including 5 builders, 2
dressmakers, 1 plumber, 1 printer, 4 shoemakers, 10 tailors, and
1 upholsterer, plus an estimated 26 low-skilled workers, with 12
barbers, 5 cleaners, 3 hairdressers, and 6 shoeshiners.

179. There were two African American newspapers: the
Tulsa Star and the Oklahoma Sun.  Moreover, Greenwood was also
home to a local business league, various fraternal orders, a
Y.M.C.A. branch, and a number of women's clubs.[41]

---

Commission Report, 37, 40 (2001).
41. Dr. Scott Ellsworth, The Tulsa Race Riot, published with the
Commission Report, 37, 39 (2001).

180. On a *per capita* basis, there were more churches in Greenwood than there were in the city's white community as well as a number of Bible study groups, Christian youth organizations, and chapters of national religious societies. All told, there were more than a dozen African American churches in Tulsa at the time of the riot, including First Baptist, Vernon A.M.E., Brown's Chapel, Morning Star, Bethel Seventh Day Adventist, and Paradise Baptist, as well as Church of God, Nazarene, and Church of God in Christ congregations. Mount Zion Baptist Church was dedicated on April 10, 1921—less than eight weeks before the riot.

181. Greenwood was also home to other highly successful business entrepreneurs, including two hotels: the Gurley Hotel and the Stradford Hotel. The Stradford was a modern fifty-four room structure, one of the largest African American-owned businesses in Oklahoma.

182. Most of the African American-owned businesses in Tulsa were much more modest. Scattered about the district were numerous small stores, from two-seater barbershops to family-run grocery stores, that helped to make pre-riot Greenwood, on a *per capita* basis, one of the most business-laden African American communities in the country.

B. Prelude to the Riot

183. In the early evening of May 31, 1921, a crowd of whites began gathering at the Tulsa County Courthouse, drawn there in part because of a newspaper story suggesting that a nineteen year-old African American youth, Dick Rowland, had assaulted a white elevator operator, seventeen-year-old Sarah Page.

184. Sometime around 4:00 to 5:00 p.m., and certainly by 6:30 p.m., rumors circulated in the Greenwood community that Dick Rowland would be lynched that evening.

185. The previous August, a mob had taken a man out of the cell where Rowland was being held, and lynched him. Twenty-three African Americans had been lynched in the previous decade.

186. Two prominent African Americans came to the Courthouse to investigate the rumored lynching.

187. Sometime after 6:30 p.m., other African Americans began to gather at the Courthouse. By about 7:00 p.m. there were perhaps about 800 people of both races at the Courthouse and tensions were running high. Some white people were yelling to "Get these niggers away from here."

188. About this time, a number of whites went to the National Guard armory seeking arms. At the same time, several carloads of armed African Americans headed towards the Courthouse to protect Dick Rowland from the gathering white mob.

189. According to J.B. Stradford, an African American businessman, Sheriff McCulloch stated that he could "handle" the

1  crowd and that he did not require assistance from the African

2  American residents of the town. He did not turn away, however,

3  a growing number of white men who continued to mob the

4  Courthouse, many of them having returned drunk from the armory.

5          190. A white man then made a speech in front of the

6  Courthouse and advised the crowd to go home, stating that

7  African Americans were riding around with high-powered revolvers

8  and guns downtown. The speech had some effect and the crowd

9  started to disperse.

10         191. At the Courthouse, a white man confronted some of

11  the African American men and began disarming them. One man

12  refused to give up his gun to the white man. The white man

13  asked, "Nigger, where you goin' with that gun?" A struggle

14  resulted, the gun went off, police officers and white men

15  started firing on the African Americans, an African American man

16  was killed, and the riot started.[42] Sheriff McCullough testified

17  that when the shot was fired, "that was just like throwing a

18  match in the powder can."[43] The street cleared quickly.

19

20  42. See Scott Ellsworth, Death in a Promised Land: The Tulsa
    Race Riot of 1921 (1982). See also Guardsmen With Machine Guns
21  Ready for Any Emergency, St. Louis Post-Dispatch 2 (June 1,
    1921) ("One version of the beginning of the trouble says the
22  first firing came shortly after dark, when a negro was stopped
    by an officer and his gun taken away. He attempted to resist,
23  according to the officer, and was shot dead. Three hours later
    his body was picked up from the street and taken to Police
24  Headquarters, which was used as a temporary morgue.").
    43. Stradford v. American Central Ins. Co, Superior Court of
25  Cook County, Illinois, No. 370,274 (1921), McCullough Deposition

26

C. The Riot Starts: All Hell Breaks Loose

192. According to O.W. Gurley, a prominent African American businessman, at that point "all hell broke loose."

193. As the streets cleared, the African American victim of the shooting lay in front of the Courthouse. Walter White, associate secretary of the NAACP, who came to Tulsa immediately after the riot to investigate it, reported that the African American victim lay dying, under a billboard with a picture of Mary Pickford, America's sweetheart, smiling winsomely.[44]

194. Almost immediately, members of the white mob opened fire on the African American men, who defended themselves by firing back. Outnumbered more than twenty to one, the African American men fought a retreat towards the Greenwood District.

195. With armed whites in close pursuit, the African American men came under heavy gunfire along Fourth Street, two blocks north of the Courthouse.

196. A short while later, a second, deadlier, skirmish broke out at the corner of Second and Cincinnati Streets. A

---

at 19.
44. See F.W. Prentice, Oklahoma Race Riot, 90 Scribner's 151, 152 (August 1931).

---

second contingent of African American men came under fire from the rioting white mob and had to fight for their lives.

197. Heavily outnumbered by the whites, and suffering casualties, most of the African Americans were able, however, to make it safely across the Frisco railroad tracks and into Greenwood.

198. By 10:00 p.m. the police station was filled with a mob of armed whites. Groups of these white men left the police station in squads and returned sometime later.

199. The white Police Chief John A. Gustafson, deputized between 250 and 500 white men. The police issued guns to the newly deputized white citizens of Tulsa to put down what they referred to as a "Negro uprising." But the police failed to even record the names of the people to whom they gave the guns. After the riot, Police Chief Gustafson pleaded in the pages of a white Tulsa newspaper for the return of guns, stating they were issued with the understanding that they would be returned when the need for them passed.

200. The police department ordered commandeered the gun shops and the pawnshops and issued guns to the newly deputized white mob that then made its way towards Greenwood. The police department also ordered deputies and non-deputies alike to "go home, get a gun, and get a nigger."[45]

_____

45. Dr. Scott Ellsworth, The Tulsa Race Riot, published with the

1    201. Local officials sought the assistance of the

2    State National Guard.

3    202. A State National Guard commander arrived with two

4    officers and sixteen men at approximately 10:30 p.m.  They went

5    to the police station, where they began working in conjunction

6    with the police.

7    203. Binkley Wright, who was seventeen at the time of

8    the riot, was an eyewitness to the events.

9    204. According to one Survivor, Binkley Wright,

10   African Americans formed a "protective brigade" at Mt. Zion

11   Baptist Church, helping to fight off the rioting white mob,

12   which included newly deputized members of the police department,

13   entering Greenwood.

14   205. Binkley Wright saw many African Americans killed

15   when the white mob, including newly deputized members of the

16   police department and men in military uniform, broke through and

17   heavily attacked the Church.

18   206. Throughout the night of May 31, 1921 to June 1,

19   1921, the white mob, including men newly deputized by the police

20   department, came across the Frisco railroad into Greenwood.

21   Although outnumbered, the African American residents fought to

22   keep them out, but the whites forced their way into Greenwood,

23

24   _____

25   Commission Report, 37, 64 (2001).

26

shooting, wounding, and killing many African Americans, and
burning down everything in their path.

207. State National Guardsmen fired upon a number of
African American Greenwood residents in the process of
responding to the "Negro uprising." Some time after 11:00 p.m.,
twenty Guardsmen arrived at the police station, where they had
set up headquarters. They guarded the border between white
Tulsa and the African American Greenwood District for several
hours.

208. Some African Americans attempted to organize an
effort to defend themselves against the oncoming mob, which
included newly deputized members of the police department, on
Brickyard Hill between Haskell and Jasper Streets.

209. Between the hours of 1:00 a.m. and 2:00 a.m.,
J.B.A. Robertson, the Governor of Oklahoma, declared martial law
throughout Tulsa County, and ordered the troops to suppress the
"Negro Uprising."[46]

210. The Guard, which had been instructed by the State
to restore order, on some occasions joined the rioters instead,
acting "like wild men."[47]

211. At 1:15 a.m. some white Guardsmen placed a
machine gun on a truck, along with three experienced white
machine gunners and six other white enlisted men. They traveled

---

46. Id. at 12-13.

around the city putting down African American efforts to defend themselves from the white mob. At 3:00 a.m., Guardsmen were ordered to Stand Pipe Hill. Their commander deployed the Guardsmen along Detroit Avenue, from Stand Pipe Hill to Archer Street, on the west side of Greenwood. They began a bridgehead into Greenwood, using a truck with a machine gun mounted upon it, and entered the town, disarming and placing African American men in "protective custody" and sending them to the Convention Hall by police cars and trucks.

212. African Americans at Paradise Baptist Church told one survivor, Binkley Wright, that the mayor of the CITY OF TULSA had opened the Armory and given two machine guns to whites and that whites "were using those machine guns to mow down our people."[48]

213. Binkley Wright was then asked by some of the African American men to aid in the defense of Greenwood, loading and reloading guns behind the steps of Paradise Baptist Church for the human chain of African American defenders.

214. Later, these African Americans moved on to Stand Pipe Hill to defend the people of North Tulsa who were under attack. Led by "Peg-Leg" Taylor, these African Americans met and "conferenced" behind the steps of Paradise Baptist Church.

---

47. Prologue to Commission Report at viii.
48. Testimony of Binkley Wright published by the Tulsa Reparations Coalition on their web page at

Draft G                                                    COMPLAINT

Then they made a human chain and went up the hill to defend African Americans from the white mob.

215. The white mob, including recently deputized members of the police department and uniformed members of the National Guard, were firing machine guns.

216. This white mob, containing newly deputized members of the police department, and Guardsmen outnumbered and shot the African American men stationed at Paradise Baptist Church.

217. Plaintiff KINNY BOOKER witnessed bullets raining down upon him, either from an airplane or Stand Pipe Hill, while he hid in the upper floors of his home.

218. On June 1, 1921, there were only two planes in Tulsa. One was a government-owned plane. The government may have commandeered other planes.[49]

219. At Sunset Hill, located on the northwest side of Greenwood, the Guardsmen advanced on the African Americans living there and fired at will for nearly half an hour. Before advancing on Greenwood, they shot the African American men, women, and children who hid behind barricades to defend their homes. The guardsmen also attacked African Americans barricaded in a concrete store in the northeast corner of Greenwood. The

http://www.tulsareparations.org/.
49. Richard Warner, Airplanes and the Riot, published with the Commission Report, 103, 104 (2001).

Guardsmen fought along side white civilians, including those who had been newly deputized by the police department, killing African Americans.

220. At some point during the Riot, the Chief of Police informed a prominent African American businessman that if the African American residents ceased their resistance to the white mob, they would be "treated fairly" the next day.

221. As soon as the African American residents stopped defending themselves, however, the Chief of Police contacted nearby cities and towns for reinforcements. By 9:00 a.m. the next day, Guardsmen had arrived from Muskogee, Oklahoma City, and Wagoner.[50]

222. At 5:00 a.m., in the morning of June 1, 1921, a whistle blew as a signal to the white mob, containing individuals newly deputized by the police department, and the National Guard, to enter Greenwood.

223. The Guardsmen worked in close conjunction with the Tulsa police. The police and Guardsmen placed a large number of Greenwood residents in "protective custody", a euphemism for illegal imprisonment, and turned them over to the police cars that stood close by.

---

50. See 85 Whites and Negroes Die in Tulsa Riots as 3,000 Armed Men Battle in Streets, 30 Blocks Burned, Military Rule in City, N.Y. Times, June 2, 1921, at 2.

224. Defendants instructed the Guard to take the African American residents of Greenwood into "protective custody."[51] The majority of the city's African American men, women, and children had either fled to the countryside or were to be held — allegedly for their own protection — against their will in one of a handful of hastily set-up internment centers, including Convention Hall, the Fairgrounds, and McNulty Baseball Park.

225. Plaintiff KINNY BOOKER was removed from his home some time after martial law was declared. Even though Plaintiff KINNY BOOKER and his sister and three brothers hid in the attic, and despite the pleas of his father, the rioting white mob set his home on fire. His family was able to get out without injury despite coming under small arms fire.

226. Plaintiff KINNY BOOKER's family was transported by the National Guard to Convention Hall.

227. As the Guardsmen were advancing, the white mob accompanying them, and including individuals newly deputized by the white police department, set fires all over Greenwood. As the Guardsmen swept through Greenwood disarming and placing the residents in "protective custody," the white mob followed closely after setting fire to the buildings.

---

51. See Scott Ellsworth, Death in a Promised Land: The Tulsa Race Riot of 1921 61 (1982).

228. Brigadier General Charles F. Barrett, who was in
charge of the National Guard brigade, stated that, on the
morning of June 1, 1921, he witnessed a rioting white mob of
15,000 to 20,000 in Greenwood, which was by now on fire. The
National Guard marched through the crowded streets. Trucks
loaded with scared and partially clothed African American men,
women, and children were parading the streets under heavily
armed guards.

229. "Personal belongings and household goods had been
removed from many homes and piled in the streets. On the steps
of the few houses that remained sat feeble and gray Negro men
and women and occasionally a small child. The look in their
eyes was one of dejection and supplication. Judging from their
attitude, it was not of material consequence to them whether
they lived or died. Harmless themselves, they apparently could
not conceive the brutality and fiendishness of men who would
deliberately set fire to the homes of their friends and
neighbors and just as deliberately shoot them down in their
tracks."[52]

230. Brigadier General Barrett wrote that "In all my
experience, I have never witnessed such scenes that prevailed in
this city when I arrived at the height of the rioting — 25,000

---

52. Tulsa Daily World, June 2, 1921 (cited in Prologue to
Commission Report at iv).

whites, armed to the teeth were ranging the city in utter and
ruthless defiance of every concept of law and righteousness.
Motorcars bristling with guns swept through your city, their
occupants firing at will."[53]

231. Maurice Willows, the Director of the local Red
Cross, stated that "all that fire, rifles, revolvers, machine
guns, and inhuman bestiality could be done with 35 city blocks
with its 10,000 Negro population, was done."[54]

232. The Guardsmen facilitated the destruction of
Greenwood. They removed African American residents against
their will. Many of these residents believed that, if the
Guardsmen would only help them, they were capable of defending
themselves and their property from the depredations of the white
mob, which included individuals newly deputized by the police
department. Instead, the Guard worked at the Defendants'
direction to place African American Greenwood residents in
"protective custody" instead of protecting Greenwood property.

233. All firing had ceased by 11:00 a.m., not because
the Guard had succeeded in bringing the white rioters under
control but rather because the African American Greenwood
residents had been killed, placed in "protective custody," or

53. Charles F. Barrett, Oklahoma After Fifty Years: A History of
the Sooner State and Its People, 1889-1939 (1941).
54. Id.

1  driven out.[55]  Even after the Riot ceased, the newly deputized

2  white citizens were told that they were to "go out and shoot any

3  nigger you see and the law'll be behind you."[56]

4  　　　　234. As many as 300 African Americans were killed.[57]

5  　　　　235. Forty-two square blocks of property was laid

6  waste in ashes and 8,000-10,000 African Americans were rendered

7  homeless.[58]

8  　　　　236. Defendant the CITY OF TULSA held many of the

9  African American men, women, and children in custody against

10  their will for days after the riots.  The police and National

11  Guard were used as guards in the various camps to ensure the

12  African Americans remained in custody.  The STATE OF OKLAHOMA

13  and the CITY OF TULSA forced African Americans to work their way

14  out of custody by cleaning up the destruction caused by the

15  white rioters.  At some time on June 2, General Barrett issued

16  Field Order Number 4, which decreed that "all able bodied

17  [N]egro men remaining in detention camp at the Fairgrounds and

18  other places in the City of Tulsa [would] be required to render

19  such service and perform such labor as [was] required by the

20  military commission."[59]  The African American Greenwood residents

21  ───────────────────────────

22  55. Alfred Brophy, Reconstructing the Dreamland : The Tulsa Riot
of 1921 (2002).

23  56. R. Halliburton, Jr., The Tulsa Race War of 1921 10 (1975).
57. Commission Report at 12-13.

24  58. Charles F. Barrett, Oklahoma After Fifty Years: A History of
the Sooner State and Its People, 1889-1939 (1941).

25  59. Gerald Jerome Smith, Note: Constitutionality Of States' Use

26

were treated like chattel and, in treatment reminiscent of slavery, were often only released when their white employer vouched for them.  Those released wore green tags to identify that they had been properly released from custody.

### D.  Defendants' Policy and Custom
### of Racial Discrimination

237. The Defendants engaged in a longstanding and official policy, practice, custom, habit and usage to deny African Americans their equal rights under the law.  This was done in numerous ways, described below.

238. Defendants permitted Plaintiffs to be physically attacked — even participating in some of the attacks — resulting in bodily injury, death and destruction and theft of property.  Defendants, with deliberate indifference and on the basis of race, failed to protect Plaintiffs from repeated criminal acts, failed to equally enforce the laws and branded Plaintiffs with the racial badges of inferiority and slavery in the form of racially motivated violence.  Defendants' failure to prevent or aid in preventing the commission of racial crimes exacerbated the riot and led to further wrongs against Plaintiffs.  Defendants failed to adequately train and supervise

---

Of Police And Military Force to Arrest, Detain, And Confine American Citizens Because Of Race, 27 Okla. City U. L. Rev. 451

---

those persons it deputized and those persons to whom it issued
ammunition during the riot. Defendants failed to meaningfully
investigate and act upon complaints filed by Plaintiffs on the
basis of race. Defendants routinely under-investigated, under-
responded, undercharged, mishandled and failed to protect
Plaintiffs from a series of criminal acts or prosecute those
responsible for such acts. Defendants abdicated their
responsibility to investigate, develop and charge white citizens
with crimes against Plaintiffs, thereby ratifying and jointly
participating in racially motivated acts to deprive Plaintiffs
of their constitutional and statutory rights. Defendants made
decisions on a racially discriminatory basis. Defendants failed
to make restitution and reparations it promised Plaintiffs.

239. All of Defendants' actions and inaction, as
alleged in the Complaint, were pursuant to Defendants' policy,
custom, habit, usage and pattern and practice of unequal
enforcement of the law depriving Plaintiffs of their Fourteenth
Amendment constitutional rights and statutory rights.
Defendants did not treat white citizens in the same or similar
manner to Plaintiffs.

240. As a direct and proximate result of Defendants'
unconstitutional and illegal racially motivated actions,
Plaintiffs have suffered the loss of their property, physical

454-55 (2002).

1 injury, and emotional distress from witnessing the murder and

2 injury of their family members.

3

4         E.   Findings of The Oklahoma Commission to

5             Study the Tulsa Race Riot of 1921

6      241. The 1921 Tulsa Race Riot Commission was created

7 pursuant to House Joint Resolution No. 1035. The statute, as

8 amended, charged the commission to:

9    "undertake a study to develop a historical record of
   the 1921 Tulsa Race Riot including the identification

10    of persons who:

11    1.   Can provide adequate proof to the Commission that
       the person was an actual resident of the

12        Greenwood area or community of the City of Tulsa
       on or about May 31, 1921, or June 1, 1921; or

13

14    2.   Can demonstrate to the satisfaction of the
       members of the Commission that the person

15        sustained an identifiable loss to their person,
       personal relations, real property, personal

16        property or other loss as a result of tortious or
       criminal conduct, whether or not the conduct was
       ever adjudicated, occurring during the period

17        beginning on or about May 31, 1921, and ending
       not later than June 30, 1921, resulting from the

18        activity commonly described as the 1921 Tulsa
       Race Riot."[60]

19

20      242. The Statute also required that the Commission

21 produce, by February 28, 2001, "a final report of its findings

22 and recommendations" and to submit that report "in writing to

23 the Governor, the Speaker of the House of Representatives, the

24 ─────────────────

25 60. 74 Okl. St. Ann. §8201 (West 2000).

26

President Pro Tempore of the Senate, and the Mayor and each
member of the City Council of the City of Tulsa, Oklahoma."

243. Most importantly, under the terms of the statute:

> "The Report may contain specific recommendations
> regarding whether or not reparations can or should be
> made and the appropriate methods to achieve the
> recommendations made in the final report."[61]

244. After four years of intense study, the Commission
generated a comprehensive study that examined more than 20,000
pages on the Tulsa Race Riot.[62] The final Commission Report did
contain a recommendation that reparations should be made and
detailed the manner in which Defendants the GOVERNOR OF THE
STATE OF OKLAHOMA and the CITY OF TULSA make reparations.[63]

245. A number of documents were attached to the
Commission Report and providing support for each of the
Commission's findings concerning the causes and consequences of
the Riot, the Defendants' participation in and responsibility
for the riot, and Defendants the GOVERNOR OF THE STATE OF
OKLAHOMA's and the CITY OF TULSA's moral and legal liability to
pay restitution to the African American survivors of the Riot
and their descendants.

---

61. Id. (emphasis added).
62. Id. at 8.
63. Commission Report at 20: "Reparations are the right thing to
do."

1  246. The findings were published in the Commission

2  Report and incorporated by statute.[64]

3  247. The findings include determinations that: the

4  "root causes" of the Riot stemmed from a history racism and

5  violence in both Tulsa and Oklahoma;[65] the action or inaction of

6  "local municipal and county officials" enabled a white mob, that

7  included state and local officials, to kill 100-300 African

8  Americans, loot and burn 1,256 African American residences and

9  businesses in Greenwood;[66] and that the property lost should be

10 valued at "approximately $2 million in 1921 dollars or

11 $16,752,600 in 1999 dollars."[67]  The Oklahoma State Legislature

12 further concluded that there had been no convictions or payments

13 of any kind to the African American victims of the Riot, and

14 that "local officials attempted to block the rebuilding of the

15 Greenwood";[68] and that the Defendants ignored their "moral

16 responsibilities at the time of the riot [and have continued to

17 do so] ever since rather than confront the realities of an

18 Oklahoma history of race relations that allowed one race to 'put

19 down' another race."[69]

20

21

22

64. See 74 Okl. St. Ann. §8000.1 (West 2002).
23 65. 74 Okl. St. Ann. §8000.1.1 (West 2002).
   66. Id. at §8000.1.2.
24 67. Id. at §8000.1.3.
   68. Id.
25 69. Id. at §8000.1.6.

26

248. The Commission Report, which was endorsed by the State of Oklahoma's legislature, made the following additional findings and recommendations:

     a. "As hostile groups gathered and their confrontation worsened, municipal and county authorities failed to take actions to calm or contain the situation."[70]

     b. "At the eruption of violence, civil officials selected many men, all of them white and some of them participants in that violence, and made those men their agents as deputies."[71]

     c. "In that capacity, deputies did not stem the violence but added to it, often through overt acts themselves illegal."[72]

     d. "Public officials provided firearms and ammunition to individuals, again all of them white."[73]

     e. "Units of the Oklahoma National Guard participated in the mass arrests of all or nearly all of Greenwood's residents, removed

---

70. Commission Report at 11.
71. Id.
72. Id.
73. Id.

them to other parts of the city, and detained them in holding centers."[74]

f. "Entering the Greenwood District, [White] people stole, damaged or destroyed personal property left behind in homes and businesses."[75]

g. "[White p]eople, some of them agents of government, also deliberately burned or otherwise destroyed homes credibly estimated to have numbered 1,256, along with virtually every other structure—including churches, schools, businesses, even a hospital and library—in the Greenwood district."[76]

h. "Despite duties to preserve order and to protect property, no government at any level offered adequate resistance, if any at all, to what amounted to the destruction of the neighborhood referred to commonly as 'Little Africa' and politely as the 'Negro quarter.'"[77]

74. Id. at 12.
75. Id.
76. Id.
77. Id.

i. "[C]redible evidence makes it probable that
   many people, likely numbering between one and
   three hundred, were killed during the riot."[78]

j. "Not one of these criminal acts was then or
   ever has been prosecuted or punished by
   government at any level, municipal, county,
   state, or federal."[79]

k. "Even after the restoration of order it was
   official policy to release a African American
   detainee only upon the application of a white
   person, and then only if that white person
   agreed to accept responsibility for that
   detainee's subsequent behavior."[80]

l. "[N]either [city and county government]
   contributed substantially to Greenwood's
   rebuilding; in fact, municipal authorities
   acted initially to impede rebuilding."[81]

m. "In the end, the restoration of Greenwood after
   its systematic destruction was left to the
   victims of that destruction."[82]

---

78. Id. at 13.
79. Id.
80. Id.
81. Id. at 14.
82. Larry O'Dell, Riot Property Loss, published with the
Commission Report, 143, 149 (2001).

1        249. According to the Report of the Oklahoma

2   Commission to study the Tulsa Race Riot of 1921, an accurate

3   assessment of the value of the property destroyed by the rioters

4   totals at least $16,752,600 in 1999 dollars.[83]

5

6                    F.    Statute of Limitations Should Be

7                          Equitably Tolled and Waived

8        250. Because of the work of the Commission, there

9   exists today a tremendous amount of information that was not

10  available in 1921 about the Tulsa Riot, Defendants the GOVERNOR

11  OF THE STATE OF OKLAHOMA's and the CITY OF TULSA's culpability,

12  and the implications of such culpability on the legal redress

13  available to the Plaintiffs.  Defendants the GOVERNOR OF THE

14  STATE OF OKLAHOMA and the CITY OF TULSA acted, both in 1921 and

15  subsequently, to hide evidence of their culpability and to

16  prevent African American victims of the Riot and their

17  descendants from bringing suit against Defendants. Furthermore,

18  the State of Oklahoma, in its statute creating the Commission,

19  waived the statute of limitations as an affirmative defense.

20  Thus, the applicable statute of limitations is subject to

21

22  _____

23        83. Scholarly studies of the race riot are in
    substantial agreement with the Commission's assessment. See,
    e.g., Alfred Brophy, Reconstructing the Dreamland : The Tulsa
24  Riot of 1921 (2002);  Roy L. Brooks, Integration or Separation?
    (1996), Ch. 17; Randall Kennedy, Foreword in Alfred Brophy,
25  Reconstructing the Dreamland : The Tulsa Riot of 1921 (2002).

26

equitable tolling or, in the alternative, to waiver, implicitly
or explicitly, by the State of Oklahoma.

251. The State of Oklahoma and its agents acting in
their official capacities and the CITY OF TULSA have
misrepresented and concealed information about their role in the
Tulsa race riot. Defendants have knowingly perpetuated
confusion and misinformation or failed to provide information
about the factual circumstances underlying the riot. As a
result of Defendants' fraudulent concealment, Plaintiffs have
been unable, even with reasonable diligence, to discover the
underlying facts and evidence to successfully bring a cause of
action. Consequently, Defendants are precluded by their own
acts and ommissions from asserting the statute of limitations as
a defense. Under the doctrine of unclean hands, Defendants are
estopped from claiming this affirmative defense.

252. The State of Oklahoma created the Commission in
large part precisely to discover hidden or suppressed facts
surrounding the Riot that could not otherwise have been
discovered by Plaintiffs. The Commission Report revealed
information never before made available to the public. The
Commission described the Commission Report as a "tower of new
knowledge" that enabled "visions never seen before."[84]
Specifically, the Commission stated that the Commission Report:

84. Commission Report at 8.

"[i]ncluded . . . records and papers long presumed lost, if their existence had been known at all. Some were official documents, pulled together and packed away, years earlier. Uncovered and examined, they took the commission back in time, back to the years just before and just after 1921. Some were musty legal records saved from the shredders. Briefs filed, dockets set, lawsuits decided—each opened an avenue into another corner of history. Pages after pages laid [sic] open the city commission's deliberations and decisions as they affected the Greenwood area. Overlooked records from the National Guard offered perspectives and illuminated them with misplaced correspondence, lost after-action reports, obscure field manuals, and self-typed accounts from men who were on duty at the riot."[85]

253. A significant amount of previously unavailable evidence—including long-forgotten documents and photographs—has been discovered.

254. Not until now has the story of the Tulsa riot been told fully and truthfully. The Report of the Oklahoma Commission to Study the Tulsa Race Riot of 1921, stated that: "Much of the evidence used in preparing the report was recently discovered":

> "Before there was this commission, much was known about the Tulsa race riot. More was unknown. It was buried somewhere, lost somewhere, or somewhere undiscovered. No longer. Old records have been reopened, missing files have been recovered, new sources have been found."[86]

---

85. Id. at 4.
86. Id. at 8.

255. The Commission Report breaks the "conspiracy of silence" that has existed for over a half century and for the first time "this past tragedy has been extensively aired."[87]

> "Until recently, the Tulsa race riot has been the most important least known event in the state's entire history. Even the most resourceful of scholars stumbled as they neared it for it was dimly lit by evidence and the evidentiary record faded more with every passing year."[88]

256. However, the history of the Riot "may now comprise the most thoroughly documented moments ever to have occurred in Oklahoma."[89] The Commission itself acknowledged surprise over the amount of "new evidence" and that it "contributed so much."[90] Even the book Death in a Promised Land; the Tulsa Race Riot of 1921, written by Scott Ellsworth (the acknowledged expert on the Riot) and published in 1982, did not have the evidence ("no one had it") contained in the Commission Report.[91]

257. Only now do Plaintiffs have sufficient information to state the nature of the causes of action they can bring and against whom. Prior to the Commission's Report, the Defendants concluded that the Tulsa race riot was "something to

---

87. Id.
88. Id. at 6.
89. Id.
90. Id. at 7.
91. Id. at 8.

be swept well beneath the history's carpet."[92]  Plaintiffs made
repeated requests for information that was denied to them by
Defendants the GOVERNOR OF THE STATE OF OKLAHOMA and CITY OF
TULSA, which prevented them from being able to pursue legal
action.  Not until the Commission published its Commission
Report were Plaintiffs provided with the information needed to
bring suit.

258. Thus, Plaintiffs are excused from the time limits
on filing, and the statute of limitations should be equitably
tolled insofar as much of the information upon which this
lawsuit rests was only discovered by the efforts of the Oklahoma
Commission to Study the Tulsa Race Riot of 1921.

259. Defendants also erected barriers making it
extremely difficult, if not impossible, for Plaintiffs to seek
legal redress for injuries resulting from the Riot.  The
atmosphere surrounding Tulsa in the wake of the Riot made
conditions potentially deadly for individuals who wanted to seek
restitution through the courts.  Such barriers included:

    a. The Grand Jury convened by the State of
       Oklahoma returned indictments against African
       Americans for inciting the Riot. Because of the
       discriminatory manner in which the indictments
       were returned, African American residents of

92. 74 Okl. St. Ann. §8000.1.4.

1    Greenwood were prevented or inhibited from

2    filing or continuing lawsuits on behalf of the

3    African American residents of Greenwood. In an

4    absurdly biased grand jury report, which was

5    orchestrated by the Oklahoma attorney general,

6    Tulsa blamed the African American community for

7    the riot, further prejudicing the claims of

8    riot victims in the courts. Tulsa prosecutors

9    threatened to imprison key Greenwood leaders,

10   like A.J. Smitherman, editor of the Tulsa Star,

11   and J.B. Stradford, which caused them to flee

12   Oklahoma. Stradford filed suit in Chicago, but

13   could not adequately prosecute his claim, for

14   fear of imprisonment and bodily harm.

15   Stradford never set foot in Oklahoma again.

16   b. The court system was infected with the Ku Klux

17   Klan, thereby resulting in a racially

18   discriminatory judicial system. In fact, about

19   one year after the Riot, Oklahoma's Governor

20   declared martial law in Tulsa, citing among

21   other reasons the pervasive control of the

22   courts by the Ku Klux Klan.[93] According to the

23   Commission Report: "Everyone (on the

24

25   93. Appellee's brief in Sanford v. Markham, 221 P. 36 (Okla.

26

Commission) agrees that within months of the
riot Tulsa's Klan chapter had become one of the
nation's largest and most powerful, able to
dictate its will with the ballot as well as the
whip. Everyone agrees that many of the city's
most prominent men were Klansmen in the early
1920's and that some remained Klansmen
throughout the decade. Everyone agrees that
Tulsa's atmosphere reeked with a Klan-like
stench that oozed through the robes of the
Hooded Order."

c. The Oklahoma Supreme Court discouraged
lawsuits by limiting municipal liability on the
basis of territorial common law,[94] and
acknowledging the role that special deputies
played in destroying Greenwood but failing to
find the CITY OF TULSA responsible for such
conduct.[95]

d. The CITY OF TULSA summarily denied the
restitution claims of African American
residents, while paying those of whites, in

1923).
94. See Alfred L. Brophy, The Tulsa Race Riot in the Oklahoma
Supreme Court, 54 Okla. L. Rev. 67 (2001).
95. See Redfearn v. American Central Insurance Co., 221 P. 929
(1926).

order to prevent or inhibit the filing or
continuance of restitution claims by the
African American citizens of Greenwood.  In
particular, the CITY OF TULSA permitted
restitution claims made by white owners of
stores who had arms or ammunition looted from
their stores.  The State of Oklahoma created
conditions so adverse to the prosecuting of
lawsuits that over 130 complaints filed against
insurers, the city, and the state, were
prevented from proceeding past the filing
stage.

e. According to the Commission Report, the state
and local governments were instruments of
repression used to prevent African Americans
from obtaining justice.  In fact, after
considering a variety of acts of violent
repression of African Americans in Oklahoma,
Commission concluded that the discussion of the
State and City Defendants' culpability in
racially motivated attacks on African Americans
in the years before, during, and after the Riot
could be summed up as follows:

"In some government participated in the
deed.

> In some government performed the deed.
>
> In none did government prevent the
> deed.
>
> In none did government punish the
> deed."[96]

      f. Oklahoma history textbooks published during the 1920s did not mention the riot at all—nor did ones published in the 1930s.

185. Accordingly, the CITY OF TULSA and the GOVERNOR OF THE STATE OF OKLAHOMA should be equitably estopped from asserting any defense premised upon laches or the tolling of a statute of limitations.

186. Alternatively, Defendant the CITY OF TULSA should be equitably estopped from asserting statute of limitation as a defense because it deliberately misled Plaintiffs in 1921, promising that restitution would be made for damages incurred during the Tulsa race riot. Plaintiffs reasonably relied upon Defendants' false statements to their detriment. Defendants knew that such assertions would result in Plaintiffs' reliance and Plaintiffs did in fact reasonably rely on Defendants' assurances by not filing suit for restitution prior to the initiation of this lawsuit.

---

96. Commission Report at 19.

187. Moreover, the CITY OF TULSA in 1921 also waived the statute of limitations as an affirmative defense by its express commitment to provide restitution for riot victims. Specifically, the City stated that a claims commission would compensate the victims of the riot, thereby inducing them not to file suit. In particular, the Tulsa Chamber of Commerce stated that as "quickly as possible rehabilitation will take place and reparation made . . . . Tulsa feels intensely humiliated."[97]

188. Furthermore, Defendant the GOVERNOR OF THE STATE OF OKLAHOMA resurrected Plaintiffs' claims for restitution in 1997 and can not seek harbour behind a statute of limitations defense.

189. More specifically, in 1997 and again in 1999, the State Legislature commissioned a report from the Commission, funded the Commission, and charged it with conducting an investigation to determine the causes of the Riot, identify those parties responsible for the Riot and the victims, and to make recommendations regarding reparations and restitution.

190. House Joint Resolution 1035 (1997), the statute passed by the Oklahoma legislature and that created the

---

97. Alfred Brophy, Reconstructing the Dreamland : The Tulsa Riot of 1921 107 (2002); and at n. 85. (In the June 15, 1921 issue of the Nation, the Chair of the Emergency Committee stated that "Tulsa weeps at this unspeakable crime and will make good the damage, so far as it can be done, to the last penny.").

1  Commission, waives the statute of limitations defense. That

2  statute conceded that:

3      "black persons of that era were practically denied
       equal access to the civil or criminal justice system
4      in order to obtain damages or other relief for the
       tortious and criminal conduct which had been
5      committed."

6
   and that:
7
       "the Greenwood community and the residents who lived
8      and worked there were irrevocably damaged by the
       tortious and criminal conduct that occurred during the
9      Tulsa Race Riot; . . . and ... at the time of the 1921
       riot in the City of Tulsa, the Oklahoma Constitution
10     contained provisions, still effective as law, which
       provided that: 'All persons have the inherent right
11     to life, liberty, the pursuit of happiness, and the
       enjoyment of the gains of their own industry.' and
12     further that: 'the courts of justice of the State
       shall be open to every person, and speedy and certain
13     remedy afforded for every wrong and for every injury
       to person, property and reputation; and right and
14     justice shall be administered without sale, denial,
       delay or prejudice.'"

15

16     191. The Oklahoma State Legislature empowered the

17  Commission to redress these wrongs, and in so doing waived any

18  limitations defense the State may mount.

19     192. Furthermore, the Oklahoma State Legislature, in

20  adopting and implementing the Commission's findings and

21  recommendations by creating The Tulsa Reconciliation Education

22  and Scholarship Program[98] and the Tulsa Riot Memorial and

23

24  _____

25  98. See 70 Okl. St. Ann. §2621 (West 2002).

26

Reconciliation Act,[99] has expressly or implicitly waived any limitations defense it may mount, since these measures adopt the injunctive relief recommended by the Commission. The State cannot arbitrarily choose between the remedies recommended by the Commission when adopting the Commission's Report, and has therefore waived its statute of limitations defense.

193. Finally, Governor Keating, acting in his official capacity as GOVERNOR OF THE STATE OF OKLAHOMA, stated that he "supported direct payments to the 120 survivors of the bloody riots if the report contained persuasive evidence of state culpability."[100] Governor Keating admitted that "Compensation for direct loss occasioned by direct state or city action is not inappropriate. . . . But it has to be shown that there was real harm to existing, living individuals and that direct action by the city and the state caused the harm"[101] Clearly, the Commission Report demonstrates such harm. Governor Keating's statement demonstrates the State's express or implied intent to waive any limitations defense should legal liability be established.

---

99. See id. at §8201.1.
100. Lois Romano, No Vow to Make Amends for Tulsa; Legislators' Sidestepping Disappoints Survivors of 1921 Race Riot, The Washington Post, Thursday, March 1, 2001 Section A.
101. Lois Romano, Tulsa Airs a Race Riot's Legacy; State Historical Panel's Call for Restitution Spurs a Debate, The Washington Post, Wednesday, January 19, 2000, at Section A.

1

2          FIRST CAUSE OF ACTION

3        FOR DEPRIVATION OF LIFE AND LIBERTY

4        AND THE PRIVILEGES AND IMMUNITIES

5          OF UNITED STATES CITIZENSHIP

6      IN VIOLATION OF THE FOURTEENTH AMENDMENT

7        OF THE UNITED STATES CONSTITUTION

8      (Against the CITY OF TULSA, THE CHIEF OF POLICE,

9            and THE TULSA POLICE DEPARTMENT)

10

11          194. Plaintiffs repeat and reallege the above

12   allegations as if fully set forth herein.

13          195. Defendants deprived the following Plaintiffs of

14   their constitutionally protected interest in their life,

15   liberty, and bodily integrity, and in enjoying the privileges

16   and immunities of their United States citizenship: JOHN

17   ALEXANDER, JUANITA SMITH BOOKER, KINNEY BOOKER, DOROTHY BOOKER

18   BOULDING, JOHNNIE L. GRAYSON BROWN, JOE R. BURNS, ROSA L. GREEN

19   BYNUM, BEATRICE CAMPBELL-WEBSTER, NAOMI HOOKER CHAMBERLAIN,

20   MILDRED MITCHELL CHRISTOPHER, CARRIE HUMPHREY CUDJOE, LUCILLE

21   BUCHANAN FIGURES, ERNESTINE GIBBS, HAROLD GIBBS, HAZEL FRANKLIN

22   HACKETT, MADELEINE HAYNES, JOYCE WALKER HILL, VERA INGRAM,

23   EUNICE CLOMAN JACKSON, DR. HOBART JARRETT, HAZEL DELORES SMITH

24   JONES, MARY TACOMA MAUPIN, ALICE HIGGS LOLLIS, ISHMAEL S. MORAN,

25   SIMON R. RICHARDSON, BEULAH LOREE KEENAN SMITH, GOLDEN WILLIAMS

26

1 | SMITH, DOROTHY WILSON STRICKLAND, LOIS WHITE TAYLOR, BERTRAM C.

2 | WILLIAMS, LOUIE BARTON WILLIAMS, and WESS YOUNG.

3 | 196. The following plaintiffs had relatives who were

4 | killed by Defendants: J.B. BATES, LEROY LEON HATCHER, and CECIL

5 | WHITE.

6 | 197. The following plaintiffs were physically and

7 | emotionally injured by Defendants: CARRIE HUMPHREY CUDJOE, JAMES

8 | DURANT, BEULAH LOREE KEENAN SMITH, LOLA SNEED SNOWDEN, and MARIE

9 | WHITEHORN

10 | 198. Defendants' actions were deliberate and

11 | premediated. Such actions shock the conscience, and demonstrate

12 | a deliberate indifference to life, liberty and bodily integrity.

13 | 199. As a consequence of Defendants' actions,

14 | Plaintiffs JOHN ALEXANDER, JUANITA SMITH BOOKER, KINNEY BOOKER,

15 | DOROTHY BOOKER BOULDING, JOHNNIE L. GRAYSON BROWN, JOE R. BURNS,

16 | ROSA L. GREEN BYNUM, BEATRICE CAMPBELL-WEBSTER, NAOMI HOOKER

17 | CHAMBERLAIN, MILDRED MITCHELL CHRISTOPHER, CARRIE HUMPHREY

18 | CUDJOE, LUCILLE BUCHANAN FIGURES, ERNESTINE GIBBS, HAROLD GIBBS,

19 | HAZEL FRANKLIN HACKETT, MADELEINE HAYNES, JOYCE WALKER HILL,

20 | VERA INGRAM, EUNICE CLOMAN JACKSON, DR. HOBART JARRETT, HAZEL

21 | DELORES SMITH JONES, MARY TACOMA MAUPIN, ALICE HIGGS LOLLIS,

22 | ISHMAEL S. MORAN, SIMON R. RICHARDSON, BEULAH LOREE KEENAN

23 | SMITH, GOLDEN WILLIAMS SMITH, DOROTHY WILSON STRICKLAND, LOIS

24 | WHITE TAYLOR, BERTRAM C. WILLIAMS, LOUIE BARTON WILLIAMS, WESS

25 | YOUNG, J.B. BATES, LEROY LEON HATCHER, CECIL WHITE, CARRIE

26 |

HUMPHREY CUDJOE, JAMES DURANT, BEULAH LOREE KEENAN SMITH, LOLA
SNEED SNOWDEN, and MARIE WHITEHORN have sustained physical and
mental injuries, and are entitled to damages in amount to be
determined at trial.

## SECOND CAUSE OF ACTION

### FOR DEPRIVATION OF PROPERTY AND PRIVILEGES
### AND IMMUNITIES IN VIOLATION OF THE FOURTEENTH
### AMENDMENT OF THE UNITED STATES CONSTITUTION

(Against the CITY OF TULSA, THE CHIEF OF POLICE,
and THE TULSA POLICE DEPARTMENT)

200. Plaintiffs repeat and reallege the above
allegations as if fully set forth herein.

201. Defendants deprived the following Plaintiffs of
their constitutionally protected property interest in their
residences, places of business, land, and personal property:
J.B. BATES, ESSIE LEE JOHNSON BECK, J.D. BELL, PHINES BELL,
JUANITA SMITH BOOKER, KINNEY BOOKER, DOROTHY BOOKER BOULDING,
JEANETTE McNEAL BRADSHAW, TERESA EARLEE BRIDGES DYSART, JOHNNIE
L. GRAYSON BROWN, ROSA L. GREEN BYNUM, MURIEL MIGNON LILLY
CABELL, MILDRED MITCHELL CHRISTOPHER, MILDRED LUCAS CLARK, OTIS
GRANVILLE CLARK, BLANCHE CHATMAN COLE, CARRIE HUMPHREY CUDJOE,
HATTIE LILLY DUNN, JAMES DURANT, LUCILLE BUCHANAN FIGURES,

ARCHIE JACKSON FRANKLIN, JIMMIE LILLY FRANKLIN, ERNESTINE GIBBS, HAROLD GIBBS, MARGARET TILLEY GIBBS, THERESSA CORNELIA McNEAL GILLIAM, LEON GRAYS, SR., MILDRED JOHNSON HALL HAZEL FRANKLIN HACKETT, LEROY LEON HATCHER, MADELEINE HAYNES, JAMES FRISSELL "BOTTLEHEAD" HILL, JOYCE WALKER HILL, DR. OLIVIA J. HOOKER, SAMUEL L. HOOKER, JR., WILHELMINA GUESS HOWELL, VERA INGRAM, GENEVIEVE ELIZABETH TILLMAN JACKSON, DR. HOBART JARRETT, WILMA MITCHELL JOHNSON, HAZEL DELORES SMITH JONES, THELMA KNIGHT, CAROL SMITHERMAN MARTIN, MARY TACOMA MAUPIN, RUTH DEAN NASH, SIMEON L. NEAL, ALMADGE J. NEWKIRK, JUANITA MAXINE SCOTT PARRY, IDA BURNS PATTERSON, DELOIS VADEN RAMSEY, JEWEL SMITHERMAN ROGERS, JULIUS WARREN SCOTT, VENEICE DUNN SIMS, BEULAH LOREE KEENAN SMITH, GOLDEN WILLIAMS SMITH, LOLA SNEED SNOWDEN, JAMES L. STEWARD, DOROTHY WILSON STRICKLAND, LOIS WHITE TAYLOR, WILLIE MAE SHELBURN THOMPSON, EFFIE LEE SPEARS TODD, MELVIN C. TODD, QUEEN ESTHER LOVE WALKER, SAMUEL WALKER, TROY SIDNEY WALKER, and MARY LEON BROWN WATSON.

202. Defendants burned, looted, and otherwise destroyed or misappropriated these Plaintiffs' property of without a hearing and without due process of law in violation of their property rights and the privileges and immunities of their citizenship as guaranteed under the Fourteenth Amendment of the United States Constitution.[102]

---

102. See, e.g., Clarence Thomas, The Higher Law Background of

203. Defendants have never returned such misappropriated property or paid compensation for its loss.

204. Plaintiffs J.B. BATES, ESSIE LEE JOHNSON BECK, J.D. BELL, PHINES BELL, JUANITA SMITH BOOKER, KINNEY BOOKER, DOROTHY BOOKER BOULDING, JEANETTE McNEAL BRADSHAW, TERESA EARLEE BRIDGES DYSART, JOHNNIE L. GRAYSON BROWN, ROSA L. GREEN BYNUM, MURIEL MIGNON LILLY CABELL, MILDRED MITCHELL CHRISTOPHER, MILDRED LUCAS CLARK, OTIS GRANVILLE CLARK, BLANCHE CHATMAN COLE, CARRIE HUMPHREY CUDJOE, HATTIE LILLY DUNN, JAMES DURANT, LUCILLE BUCHANAN FIGURES, ARCHIE JACKSON FRANKLIN, JIMMIE LILLY FRANKLIN, ERNESTINE GIBBS, HAROLD GIBBS, MARGARET TILLEY GIBBS, THERESSA CORNELLA McNEAL GILLIAM, LEON GRAYS, SR., MILDRED JOHNSON HALL HAZEL FRANKLIN HACKETT, LEROY LEON HATCHER, MADELEINE HAYNES, JAMES FRISSELL "BOTTLEHEAD" HILL, JOYCE WALKER HILL, DR. OLIVIA J. HOOKER, SAMUEL L. HOOKER, JR., WILHELMINA GUESS HOWELL, VERA INGRAM, GENEVIEVE ELIZABETH TILLMAN JACKSON, DR. HOBART JARRETT, WILMA MITCHELL JOHNSON, HAZEL DELORES SMITH JONES, THELMA KNIGHT, CAROL SMITHERMAN MARTIN, MARY TACOMA MAUPIN, RUTH DEAN NASH, SIMEON L. NEAL, ALMADGE J. NEWKIRK, JUANITA MAXINE SCOTT PARRY, IDA BURNS PATTERSON, DELOIS VADEN RAMSEY, JEWEL SMITHERMAN ROGERS, JULIUS WARREN SCOTT, VENEICE DUNN SIMS, BEULAH LOREE KEENAN SMITH, GOLDEN WILLIAMS SMITH,

the Privileges or Immunities Clause, 12 Harv. J.L. & Pub. Pol. 63, 68 (1989); Philip B. Kirkland, The Privileges or Immunities Clause: Its Hour Come 'Round at Last, Its Hour Come 'Round at

1 | LOLA SNEED SNOWDEN, JAMES L. STEWARD, DOROTHY WILSON STRICKLAND,
2 | LOIS WHITE TAYLOR, WILLIE MAE SHELBURN THOMPSON, EFFIE LEE
3 | SPEARS TODD, MELVIN C. TODD, QUEEN ESTHER LOVE WALKER, SAMUEL
4 | WALKER, TROY SIDNEY WALKER, and MARY LEON BROWN WATSON. have
5 | suffered property damage in an amount to be specified at trial.
6
7 | <center>THIRD CAUSE OF ACTION</center>
8 | <center>FOR VIOLATION OF THE EQUAL PROTECTION</center>
9 | <center>CLAUSE AND THE PRIVILEGES AND IMMUNITIES</center>
10 | <center>CLAUSE OF THE FOURTEENTH AMENDMENT</center>
11 | <center>TO THE UNITED STATES CONSTITUTION</center>
12 | <center>(Against the CITY OF TULSA, THE CHIEF OF POLICE,</center>
13 | <center>and THE TULSA POLICE DEPARTMENT)</center>
14 | 205. Plaintiffs repeat and reallege the above
15 | allegations as if fully set forth herein.
16 | 206. Defendants deprived all of the Plaintiffs of
17 | their right to equal protection of the laws and the privileges
18 | and immunities of their citizenship as guaranteed under the
19 | Fourteenth Amendment of the United States Constitution.
20 | 207. The Defendants engaged in a longstanding and
21 | official policy, practice, custom, habit and usage to deny
22 | African Americans their equal rights under the law.  This was
23 | done in numerous ways, described below.
24
25 | Last? 1972 Washington Univ. L.Q. 405 at 418-420.
26

Draft G

<center>-125-</center>

COMPLAINT

1        208. Defendants permitted Plaintiffs to be physically
2 attacked, even participating in some of the attacks, resulting
3 in bodily injury, death and destruction and theft of property.
4 Defendants, with deliberate indifference and on the basis of
5 race, failed to protect Plaintiffs from repeated criminal acts,
6 failed to equally enforce the laws and branded Plaintiffs with
7 the racial badges of inferiority and slavery in the form of
8 racial epithets.  Defendants' failure to prevent or aid in
9 preventing the commission of racial crimes exacerbated the riot
10 and led to further wrongs against Plaintiffs.  Defendants failed
11 to adequately train and supervise those persons it deputized and
12 those persons to whom it issued ammunition during the riot.
13 Defendants failed to meaningfully investigate and act upon
14 complaints filed by Plaintiffs on the basis of race.  Defendants
15 routinely underinvestigated, underresponded, undercharged,
16 mishandled and failed to protect Plaintiffs from a series of
17 criminal acts or prosecute those responsible for such acts.
18 Defendants abdicated their responsibility to investigate,
19 develop and charge white citizens with crimes against
20 Plaintiffs, thereby affirming and jointly participating in
21 racially motivated acts to deprive Plaintiffs of their
22 constitutional and statutory rights.  Defendants failed to make
23 whole Plaintiffs by providing restitution and reparations it
24 promised and committed to them.
25
26

209. Defendants did not treat white citizens in the same or similar manner to Plaintiffs.

210. As a consequence of the intentional racially discriminatory acts of Defendants, all of the Plaintiffs were denied the equal protection of the laws and the privileges and immunities of their United States citizenship in violation of the Fourteenth Amendment, and are entitled to damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION

### FOR VIOLATION OF U.S.C. §1981

#### (Against All Defendants)

211. Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

212. The State of Oklahoma has waived its immunity by setting up a Commission for the purpose of establishing liability, identifying those responsible for the Riot and those victimized by it, and committing itself to pay restitution or reparations if liability was found.

213. Defendants deprived all of the Plaintiffs of their "full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens" in violation of 42 U.S.C. §1981.

1    214. Defendants also denied Plaintiffs the same right
2    to sue as is enjoyed by white citizens, in violation of 42
3    U.S.C. §1981.

4    215. Defendants specifically targeted Plaintiffs on
5    the basis of their race. This intentional discrimination was
6    accomplished by a longstanding and official policy, practice,
7    custom, habit and usage to deny African Americans their equal
8    rights under the law. This was done in numerous ways, described
9    below.

10   216. Defendants permitted Plaintiffs to be physically
11   attacked, even participating in some of the attacks, resulting
12   in bodily injury, death and destruction and theft of property.
13   Defendants, with deliberate indifference and on the basis of
14   race, failed to protect Plaintiffs from repeated criminal acts,
15   failed to equally enforce the laws and branded Plaintiffs with
16   the racial badges of inferiority and slavery in the form of
17   racial epithets. Defendants' failure to prevent or aid in
18   preventing the commission of racial crimes exacerbated the riot
19   and led to further wrongs against Plaintiffs. Defendants failed
20   to adequately train and supervise those persons it deputized and
21   those persons to whom it issued ammunition during the riot.
22   Defendants failed to meaningfully investigate and act upon
23   complaints filed by Plaintiffs on the basis of race. Defendants
24   routinely under-investigated, under-responded, undercharged,
25   mishandled and failed to protect Plaintiffs from a series of

26

1 criminal acts or prosecute those responsible for such acts.
2 Defendants abdicated their responsibility to investigate,
3 develop and charge white citizens with crimes against
4 Plaintiffs, thereby affirming and jointly participating in
5 racially motivated acts to deprive Plaintiffs of their
6 constitutional and statutory rights. Defendants failed to make
7 whole Plaintiffs by providing restitution and reparations it
8 promised to them.

9     217. Defendants did not treat white citizens in the
10 same or similar manner to Plaintiffs.

11     218. Consequently, all of Plaintiffs have sustained
12 injuries in an amount to be determined at trial.

13

14

15 FIFTH CAUSE OF ACTION

16 FOR VIOLATION OF U.S.C. §1983

17 (Against the CITY OF TULSA, THE CHIEF OF POLICE,

18 and THE TULSA POLICE DEPARTMENT)

19     219. Plaintiffs repeat and reallege the above
20 allegations as if fully set forth herein.

21     220. Defendants deprived all of the Plaintiffs of
22 their rights, privileges and immunities by engaging in a
23 longstanding and official policy, practice, custom, habit and
24 usage to deny African Americans their equal rights under the
25 law. This was done in numerous ways, described below.

26

221. Defendants permitted Plaintiffs to be physically attacked, even participating in some of the attacks, resulting in bodily injury, death and destruction and theft of property. Defendants, with deliberate indifference and on the basis of race, failed to protect Plaintiffs from repeated criminal acts, failed to equally enforce the laws and branded Plaintiffs with the racial badges of inferiority and slavery in the form of racial epithets. Defendants' failure to prevent or aid in preventing the commission of racial crimes exacerbated the riot and led to further wrongs against Plaintiffs. Defendants failed to adequately train and supervise those persons it deputized and those persons to whom it issued ammunition during the riot. Defendants failed to meaningfully investigate and act upon complaints filed by Plaintiffs on the basis of race. Defendants routinely underinvestigated, underresponded, undercharged, mishandled and failed to protect Plaintiffs from a series of criminal acts or prosecute those responsible for such acts. Defendants abdicated their responsibility to investigate, develop and charge white citizens with crimes against Plaintiffs, thereby affirming and jointly participating in racially motivated acts to deprive Plaintiffs of their constitutional and statutory rights. Defendants failed to make whole Plaintiffs by providing restitution and reparations it promised to them.

222. Defendants did not treat white citizens in the same or similar manner to Plaintiffs.

223. Consequently, all of the Plaintiffs have sustained injuries and property damage in an amount to be specified at trial.

## SIXTH CAUSE OF ACTION

### FOR VIOLATION OF U.S.C. §1985

#### (Against All Defendants)

224. Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

225. The STATE OF OKLAHOMA has waived its immunity by setting up a Commission for the purpose of establishing liability, identifying those responsible for the Riot and those victimized by it, and committing itself to pay restitution or reparations if liability was found.

226. The Defendants the STATE OF OKLAHOMA and the CITY OF TULSA conspired to deprive all of the Plaintiffs the equal protection of the laws and equal privileges and immunities under the laws, thereby injuring Plaintiffs.

227. Defendants conspired to deprive Plaintiffs the equal protection of the laws and their rights, privileges and immunities by engaging in a longstanding and official policy, practice, custom, habit and usage to deny African Americans

their equal rights under the law. This was done in numerous ways, described below.

228. Defendants permitted Plaintiffs to be physically attacked, even participating in some of the attacks, resulting in bodily injury, death and destruction and theft of property. Defendants, with deliberate indifference and on the basis of race, failed to protect Plaintiffs from repeated criminal acts, failed to equally enforce the laws and branded Plaintiffs with the racial badges of inferiority and slavery in the form of racial epithets. Defendants' failure to prevent or aid in preventing the commission of racial crimes exacerbated the riot and led to further wrongs against Plaintiffs. Defendants failed to adequately train and supervise those persons it deputized and those persons to whom it issued ammunition during the riot. Defendants failed to meaningfully investigate and act upon complaints filed by Plaintiffs on the basis of race. Defendants routinely under-investigated, under-responded, undercharged, mishandled and failed to protect Plaintiffs from a series of criminal acts or prosecute those responsible for such acts. Defendants abdicated their responsibility to investigate, develop and charge white citizens with crimes against Plaintiffs, thereby affirming and jointly participating in racially motivated acts to deprive Plaintiffs of their constitutional and statutory rights. Defendants failed to make

whole Plaintiffs by providing restitution and reparations it promised to them.

229. Defendants did not treat white citizens in the same or similar manner to Plaintiffs.

230. Defendants intentionally caused injury to al of the Plaintiffs on the basis of race, in violation of their rights, privileges and immunities secured by federal law.

231. As a result of the conspiracy between Defendants, all of the Plaintiffs have sustained injuries and property damage in an amount to be specified at trial.

### SEVENTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

(Against the STATE OF OKLAHOMA and the CITY OF TULSA)

232. Plaintiffs repeat and reallege the above allegations as if fully set forth herein.

233. The STATE OF OKLAHOMA has waived its immunity by setting up a Commission for the purpose of establishing liability, identifying those responsible for the Riot and those victimized by it, and committing itself to pay restitution or reparations if liability was found.

234. Defendants clearly and unambiguously promised to provide restitution and/or reparations to the Plaintiffs for the damage Defendants inflicted during the course of the riot;

1  Defendants reasonably foresaw that Plaintiffs would rely upon

2  those promises; Plaintiffs did rely upon those promises to their

3  detriment; and the hardship and unfairness suffered by the

4  Plaintiffs may only be avoided by the STATE OF OKLAHOMA and the

5  CITY OF TULSA restoring the benefits to which the Plaintiffs are

6  due.

7

8                  1.   State of Oklahoma

9        235. Defendant the STATE OF OKLAHOMA promised

10 Plaintiffs in 1999 that restitution and/or reparations would be

11 made for damages incurred during the Tulsa race riot, upon which

12 Plaintiffs reasonably relied to their detriment.  Defendants

13 knew that such assertions would result in Plaintiffs' reliance

14 and Plaintiffs did in fact reasonably relied on Defendants'

15 assurances by not filing suit for restitution prior.

16        236. More specifically, in 1997, pursuant to House

17 Joint Resolution 1035 (1997), the State Legislature commissioned

18 a report from the Commission, funded the Commission, and charged

19 it with conducting an investigation to determine the causes of

20 the riot, identify those parties responsible for the riot and

21 the victims, and to make recommendations regarding reparations

22 and restitution.

23        237. House Joint Resolution 1035 (1997) conceded that:

24        "black persons of that era were practically denied
           equal access to the civil or criminal justice system
25         in order to obtain damages or other relief for the

26

tortious and criminal conduct which had been
committe

and that:

> "the Greenwood community and the residents who lived
> and worked there were irrevocably damaged by the
> tortious and criminal conduct that occurred during the
> Tulsa Race Riot; . . . and ... at the time of the 1921
> riot in the City of Tulsa, the Oklahoma Constitution
> contained provisions, still effective as law, which
> provided that: 'All persons have the inherent right
> to life, liberty, the pursuit of happiness, and the
> enjoyment of the gains of their own industry.' and
> further that: 'the courts of justice of the State
> shall be open to every person, and speedy and certain
> remedy afforded for every wrong and for every injury
> to person, property and reputation; and right and
> justice shall be administered without sale, denial,
> delay or prejudice.'"

238. Furthermore, Governor Keating, acting in his

official capacity as Governor of the STATE OF OKLAHOMA, stated

that he "supported direct payments to the 120 survivors of the

bloody riots if the report contained persuasive evidence of

state culpability."[103]  Governor Keating admitted that

"Compensation for direct loss occasioned by direct state or city

action is not inappropriate. . . . But it has to be shown that

there was real harm to existing, living individuals and that

direct action by the city and the state caused the harm"[104]

Clearly, the Commission Report demonstrates such harm.

103. Lois Romano, No Vow to Make Amends for Tulsa; Legislators'
Sidestepping Disappoints Survivors of 1921 Race Riot, The
Washington Post, Thursday, March 1, 2001 Section A.
104. Lois Romano, Tulsa Airs a Race Riot's Legacy; State

1    239. The Oklahoma State Legislature empowered the
2  Commission to redress these wrongs, and it was foreseeable that
3  Plaintiffs would rely upon the recommendations contained within
4  the Commission's Report.

5    240. Furthermore, the Oklahoma State Legislature, in
6  adopting and implementing the Commission's findings and
7  recommendations by creating The Tulsa Reconciliation Education
8  and Scholarship Program[105] and the Tulsa Riot Memorial of
9  Reconciliation,[106] induced reliance by the Plaintiffs, since
10 these measures provide the injunctive relief recommended by the
11 Commission, creating the expectation that monetary relief would
12 be forthcoming.

13   241. Plaintiffs have indeed relied to their detriment
14 upon Defendant's promises by foregoing other means of
15 compensation in the justified expectation that the State would
16 compensate them for the Riot.

17   242. Plaintiffs may only be avoid the unfairness and
18 hardship resulting from Defendant's behavior by receiving the
19 compensation promised by the STATE OF OKLAHOMA in 1997 and 1999.

20

21        2.   City of Tulsa

22

23

   Historical Panel's Call for Restitution Spurs a Debate, The
24 Washington Post, Wednesday, January 19, 2000, at Section A.
   105. See 70 Okl. St. Ann. §2621 (West 2002).
25 106. See id. at §8201.1.

26

Draft G                    -136-                    COMPLAINT

1    243. Defendant the CITY OF TULSA promised Plaintiffs

2  both in 1921 and 1999 that restitution would be made for damages

3  incurred during the Tulsa Race Riot, upon which Plaintiffs

4  reasonably relied to their detriment. Defendant knew that such

5  assertions would result in Plaintiffs' reliance.

6    244. Specifically, the City stated that a claims

7  commission would compensate the victims of the riot, thereby

8  inducing them not to file suit. In particular, the Tulsa

9  Chamber of Commerce stated that as "quickly as possible

10  rehabilitation will take place and reparation made . . . .

11  Tulsa feels intensely humiliated."[107]  In the June 15, 1921 issue

12  of the Nation, the Chair of the Emergency Committee stated that

13  "Tulsa weeps at this unspeakable crime and will make good the

14  damage, so far as it can be done, to the last penny."

15    245. Plaintiffs did in fact reasonably relied on

16  Defendants' assurances by not filing suit for restitution prior

17  to the commencement of this lawsuit. Plaintiffs and their

18  families did not file lawsuits in the belief that the CITY OF

19  TULSA would compensate them for damages suffered during the

20  Riot. In reliance on this promise, Plaintiffs lost their

21  opportunity to seek the damages incurred by the Riot.

22

23

24  _____

107. Alfred Brophy, Reconstructing the Dreamland : The Tulsa
25  Riot of 1921 107 (2002).

26  _____

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief from Defendants as follows:

   i.   For general and specific damages according to proof;

   ii.  For the amount of attorney's fees and related legal expenses incurred by Plaintiffs in pursuit of the benefits to which it is entitled;

   iii. For exemplary and punitive damages in an amount sufficient to punish Defendants the CITY OF TULSA, the TULSA CHIEF OF POLICE, and the TULSA POLICE DEPARTMENT for their reprehensible behavior;

   iv.  For pre-judgment interest;

   v.   For such other and further relief, including injunctive and declaratory relief, that the Court deems just and appropriate.

Plaintiffs request a jury trial.

DATED:  February 24, 2003

James O. Goodwin, OBA #3458
Goodwin & Goodwin
P.O. Box 3257
Tulsa, OK 74101
(918) 582-9181
(918) 599-0250 (fax)

Charles J. Ogletree, Jr., BAR #272658
Jesse Climenko Professor of Law
Harvard Law School*
320 Hauser Hall
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 496-2054
(617) 496-3936 (fax)

Adjoa A. Aiyetoro, BAR #26971
Chief Legal Consultant,
National Coalition of Blacks for Reparations in America (N'COBRA)
c/o 4603 South Hall
University of California, Santa Barbara
Santa Barbara, CA 93106-3140
(202) 904-7561

Michele A. Roberts, BAR #337998
Shea & Gardner
1800 Massachusetts Ave., NW
Washington, D.C. 20036
(202) 828-2000
(202) 828-2195 (fax)

Johnnie L. Cochran, Jr., BAR #505500
Cochran, Cherry, Givens & Smith
233 Broadway 5th Floor
New York, NY 10279
(212) 553-9217
(212) 227-8763 (fax)


Dennis C. Sweet III, BAR #8105
Langston Sweet & Freese P.A.
201 N. President St.
Jackson, MS 39201
(601) 969-1356
(601) 968-3866 (fax)


Eric J. Miller, BAR#194237
Harvard Criminal Justice Institute*
320 Hauser Hall
1575 Massachusetts Avenue
Cambridge, MA 02138
(617) 384-9940
(617) 496-3936 (fax)


Leslie Mansfield, OBA #18662
Director, Clinical Programs
University of Tulsa Legal Clinic
407 South Florence Avenue
Tulsa, Oklahoma 74104-3189
(918) 631-5799

_Michael Hausfeld (90)_

Michael D. Hausfeld, BAR# 153742
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (fax)

_Suzette Malveaux (90)_

Suzette M. Malveaux, BAR#464473
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (fax)

_Jim Lloyd_

Jim Lloyd, OBA #5479
200 North Main Suite D-1
Sand Springs, OK 74063
(918) 246-0200
(918) 246-0203 (fax)

_Sharon Cole Jones_

Sharon Cole Jones, OBA #18205
P.O. Box 2749
Tulsa, OK 74101
(918) 582-9181

_Rose Sanders_

Rose Sanders, BAR #4095
(aka Faye Ora Rose Tourc)
P.O. Box 1290
Selma, Alabama 36701
(334) 875-9264
(334) 875-9375 (fax)

_Willie E. Gary (cp)_

Willie E. Gary, BAR# 0187843
Gary, Williams, Parenti, Finney
Lewis, McManus, Watson & Sperando
221 East Osceola
Stuart, FL 34994
(772) 283-8260
(772) 283-3343 (fax)

_Lorenzo Williams (cp)_

Lorenzo Williams, BAR #249874
Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando
Post Office Box 3390
Fort Pierce, FL 34948-3390
(772) 464-2352
(772) 464-4226 (fax)

_J.L. Chestnut, Jr._

J.L. Chestnut, Jr., BAR #5931-R78R
Chestnut, Sanders, Sanders, Pettaway, Campbell & Albright, P.C.
P.O. Box 1290
Selma, Alabama 36701
(334) 875-9264
(334) 875-9375 (fax)

_Joseph Sellers (cp)_

Joseph M. Sellers, BAR# 318410
Cohen, Milstein, Hausfeld & Toll, P.L.L.C.
1100 New York Avenue, N.W.
West Tower, Suite 500
Washington, D.C. 20005
(202) 408-4600
(202) 408-4699 (fax)

_Tricia Purks Hoffler (cp)_

Tricia Purks Hoffler, BAR#18864
Gary, Williams, Parenti, Finney
Lewis, McManus, Watson & Sperando
221 East Osceola
Stuart, FL 34994
(772) 283-8260
(772) 283-3343 (fax)

_Willie Gary (cp)_

Willie E. Gary, BAR# 0187843
Gary, Williams, Parenti, Finney
Lewis, McManus, Watson & Sperando
221 East Osceola
Stuart, FL 34994
(772) 283-8260
(772) 283-3343 (fax)

* For identification & mailing purposes only.